(630 P.2d 167)

No. 51,787

B. GUERRY MOORE and MARIAN MOORE, *Appellants,* v. NEW AM-MEST, INC., AMMEST GROUP, INC., and ACADEMY INSURANCE GROUP, INC., *Appellees.*

Opinion filed June 19, 1981.

*B. Guerry Moore, pro se.*

*Larry T. Solomon,* of Wunsch, Wunsch, Gaumer & Solomon, of Kingman, for the appellees.

Before ABBOTT, P.J., SWINEHART and MEYER, JJ.

SWINEHART, J.: This is an appeal from a decision of the District Court of Kingman County which adopted the court-appointed appraiser's value of the shares of stock held by dissenting shareholders to a corporate merger, pursuant to K.S.A. 17-6712.

The following issues are raised on appeal: (1) whether the appraiser used appropriate methods in valuing the stock of the dissenting shareholders at $10.01 per share and whether the trial court properly accepted those methods; (2) whether the trial court and the appraiser erroneously refused to obtain material from defendants as requested by plaintiffs; (3) whether the trial court erred by refusing to award plaintiffs interest on the value of the shares, and if so, what is the appropriate measure of interest? (4) whether the appraiser and the trial court erroneously relied upon valuations determined by defendants' experts; (5) whether the trial court erroneously upheld the use of a 20% minority discount in valuing the dissenting shares; (6) whether the appraiser and the trial court erroneously allocated 40% of the value of the sales

force to defendant Academy; (7) whether the appraiser and the trial court erroneously excluded earnings from January 1, 1978, through August 31, 1978, in valuing plaintiffs' stock as of the merger date; (8) whether the corporate real estate was properly valued; and (9) whether the trial court erroneously refused to grant plaintiffs an additional opportunity for discovery and presentation of evidence.

Defendant Ammest Group, Inc., a Kansas corporation, informed its shareholders in a notice dated July 26, 1978, it had "approved a Plan and Agreement of Reorganization providing for the merger of Ammest into New Ammest, Inc., a wholly-owned subsidiary of Academy Insurance Group, Inc. [defendant, a Pennsylvania corporation]." At the time of the proposed merger, Academy owned a controlling interest approximating 53% of the outstanding common stock in Ammest. The notice explained the reasons for the merger and contained a joint prospectus and proxy statement of the defendants. Ammest stockholders of record on July 24, 1978, were entitled to a notice of and a vote at the special meeting on the proposed merger.

On July 24, 1978, plaintiff B. Guerry Moore was the owner of 1900 shares of record. He and his wife, plaintiff Marian Moore, owned 2000 shares of record as joint tenants.

The merger was approved by a majority of the shareholders of both Ammest and Academy and became effective on August 31, 1978. Plaintiffs, along with several other Ammest shareholders, objected to the merger and perfected their rights to dissent under K.S.A. 17-6712 when they were unable to agree with defendants on a purchase price for their stock.

On January 16, 1979, the plaintiffs filed a petition requesting that the District Court of Kingman County appoint an appraiser to determine the value of their stock. Prior to a decision on their petition, plaintiffs filed a motion asking inter alia that the defendants be compelled to pay the cost of the appraisal, that the interest rate on the payment for plaintiffs' stock be set at no less than the prime rate, that the defendants produce certain documents for the appraiser and for the plaintiffs, and that the appraiser be precluded from valuing the plaintiffs' shares of stock at less than $12.12 per share. On June 21, 1979, the district court appointed John H. Harwood of A. G. Edwards & Sons, Inc., of St. Louis, Missouri, to determine the value of the stock of the

dissenting shareholders of Ammest Group, Inc., as of August 31, 1978. Prior to the appointment of the appraiser, the trial court declined plaintiffs' request to order defendants to produce various documents. The court indicated, however, that the plaintiffs could discuss the items with the appraiser.

On August 5, 1979, plaintiffs wrote Mr. Harwood asking him to review a group of documents believed important to the appraisal. On September 11, 1979, plaintiffs sent Harwood additional exhibits for his perusal. In a letter dated September 15, 1979, which was two days later than the date of the appraiser's report, plaintiffs again wrote the appraiser about various considerations they believed impacted the value of their stock.

On September 18, 1979, the appraiser filed an "Analysis to Determine the Value of the Common Stock of AMMEST GROUP, INC., San Antonio, Texas, As of August 31, 1978." The report disclosed that neither Harwood nor A. G. Edwards & Sons, Inc., had any interest in Academy or Ammest or their successor, or any other interest that might render the appraiser anything other than disinterested. The report stated that no weight in determining the value of the Ammest common stock was given to the market, earnings and dividend elements of value at the valuation date. Rather, the appraiser was limited to determining the asset element of the shares, which he concluded was $10.01 per share. He acknowledged that this value was derived from the reports of William W. Amos and Philo Smith & Co., Inc., "(independent experts retained by Ammest and Academy, respectively, to render opinions as to the fairness of the merger), adjusted to reflect our opinion as to the additional value of an Agreement between Ammest and the Non-Commissioned Officers Association of the U.S.A. ('NCOA') and to reflect the fact that the shares of the Dissenting Stockholders are minority interests."

A supplemental report was filed on September 20, 1979, in response to additional information the appraiser had received from plaintiff B. Guerry Moore as discussed in the letters dated September 11, 1979, and September 15, 1979. The appraiser reported he had reviewed all of the materials and had concluded that he had appropriately considered them in the preparation of the original report. Therefore, the appraiser reaffirmed his opinion that the value of the shares of the dissenting stockholders as of August 31, 1978, was $10.01 per share.

On November 1, 1979, plaintiffs objected to the appraiser's report and also filed a renewed motion for discovery. In a letter dated November 12, 1979, and filed on November 14, 1979, the appraiser responded to a letter of the district judge dated November 7, 1979, regarding the minority discount utilized in the report and the update of the asset values for the period between December 31, 1977, and August 31, 1978, and reaffirmed his position on the items. The trial court considered plaintiffs' objections and their renewed motion.

In a memorandum decision dated November 20, 1979, and incorporated in the journal entry filed on December 11, 1979, the trial court approved and accepted the appraiser's report of John H. Harwood in its entirety and found that the value of the stock of the Ammest Group, Inc.'s dissenting shareholders as of August 31, 1978, was $10.01 per share. The court further found plaintiffs' written objections and their renewed motion for discovery pertained to alleged wrongdoings and improprieties prior to the merger of the company on August 31, 1978, and that no remedy for such matters was afforded under K.S.A. 17-6712. The court accordingly overruled the plaintiffs' renewal of the motion for discovery. Costs, including the appraiser's fee, were assessed against defendants. The court found defendants were not required to pay interest upon the value of the dissenting shares, provided the amounts due were paid into court within 10 days of the filing of the journal entry, because there existed between plaintiffs and defendants a reasonable and bona fide dispute as to the value of the shares.

K.S.A. 17-6712 is the statutory authority for plaintiffs' action, and constitutes the basic legal background for their action. Highly summarized, the statute prescribes the procedural steps which must be taken by shareholders who object to a corporate merger and who wish an appraisal to establish the value of their stock. All necessary procedural steps were followed in this case. (See K.S.A. 17-6712[a] through [d].) Subsection (e) mandates that the district court "shall appoint an appraiser or appraisers to determine such value [the value of the shares]" of the dissenting stockholders who have complied with the relevant provisions. To accomplish the statutory charge, an appraiser is entitled to examine the corporate books and records and must also provide a reasonable opportunity to any interested parties to submit perti-

nent evidence concerning the value of the shares. Additionally, an appraiser receives the powers and authority conferred upon masters pursuant to K.S.A. 60-253. (K.S.A. 17-6712[*e*].) These powers include the authority to compel the production of "books, papers, vouchers, documents, and writings" applicable to the duties imposed upon the appraiser.

The report of the appraisers submitted to the court is subject to exceptions based upon law and fact. The *court* then is to determine the value of the stock, the stockholders entitled to payment, and whether interest is to be awarded (K.S.A. 17-6712[*f*]). Subsection (*h*) authorizes the court to assess the cost of the appraisal and, as in (*f*), to determine the amount of interest, if any, to be paid.

The defendants suggest that this court should apply a clearly erroneous standard premised upon their interpretation of K.S.A. 60-252(*a*) as the scope of review in this case. We believe, however, that the appropriate standard is whether the findings of the trial court are supported by substantial competent evidence and if the findings sufficiently support its conclusions of law, *City of Council Grove v. Ossmann*, 219 Kan. 120, 546 P.2d 1399 (1976). As it is also apparent that the controlling facts here are contained in written and documentary evidence, we have the same opportunity as the trial court to consider the evidence and to determine what the facts establish. *Stith v. Williams*, 227 Kan. 32, 605 P.2d 86 (1980).

In preparing his report, the appraiser considered four separate elements of the stock's value: asset value as a going concern, market value, earnings value, and dividend value. He concluded that the market, earnings and dividend elements of value could not be determined and, accordingly, no weight was attributed to them. Asset value was assigned a weight of 100% because it was the only factor with a determinable value at the valuation date.

In their first argument, plaintiffs maintain the appraiser employed improper methods in computing the value of their stock because the appraiser (1) personally failed to assign a specific dollar value to each asset and state the reason therefore, but instead relied upon values ascribed to the assets by two experts hired by defendants; (2) refused to appraise "contingent assets"; (3) attributed only 60% rather than 100% of the sales force to defendant Ammest; (4) relied upon the report of Philo Smith &

Co., which had an alleged adverse interest. Plaintiffs elaborate little upon their claims and provide but scant legal support for them.

Defendants counter that it is unnecessary to assign a value to each asset, that appraisers may draw upon the opinions of other experts, and that they are unaware of any authority requiring the valuation of "contingent assets."

K.S.A. 17-6712 does not detail the methods which an appraiser must utilize in valuing the stock of shareholders dissenting to a corporate merger and no Kansas case law has been located concerning the subject. A substantial body of case law from other jurisdictions has developed on the subject, however. The four elements considered by the appraiser here have received considerable recognition and support (the dividend element is often viewed as a subset of the earnings element), see, *e.g., Santee Oil Co., Inc. v. Cox,* 265 S.C. 270, 217 S.E.2d 789 (1975); *Tri-Continental Corp. v. Battye, et al.,* 31 Del. Ch. 523, 74 A.2d 71 (1950); Annot., 48 A.L.R.3d 430; 19 Am. Jur. 2d, Corporations §§ 518-520, and are not disputed by plaintiffs. Instead, plaintiffs seemingly complain that the appraiser improperly arrived at an asset value based upon a going concern.

It is helpful to bear in mind the first enunciation of the meaning of "value" of stock of dissenting shareholders pronounced by the Delaware Supreme Court in merger actions:

"The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. . . . In determining . . . [the true or intrinsic value of the stock taken in the merger] . . . the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry . . . but must be considered by the agency fixing the value." *Tri-Continental Corp. v. Battye, et al.,* 31 Del. Ch. at 526.

In its analysis of the asset value of plaintiffs' stock, the appraiser relied upon the reports of Amos and Smith which had been commissioned by defendants. He found them usable, albeit subject to certain exceptions, and as a consequence found a third valuation unnecessary. The appraiser took the average of the Amos and Smith values, *i.e.,* $11.23, then added $1.28 per share to

reflect the value of an agreement between Ammest and the Non-Commissioned Officers Association of the U.S.A. (NCOA) to procure commercial services for NCOA members. The value was then discounted 20% to represent its status as minority stock.

Plaintiffs' argument that the appraiser should have made his own valuation of defendant Ammest's assets is without merit. The appraiser independently scrutinized the Amos and Smith reports, and reviewed various other documents relevant to the question. He considered the evidence received from plaintiffs and modified the values assigned by defendants' experts as fully explained in his report. Plaintiffs do not complain about the appraiser's expertise in such valuations, and the trial court could rightly assume that the appraiser applied a discriminating eye in assessing the reports he knew had been compiled by defendants' experts.

The cases are replete with examples of a court-appointed appraiser's acceptance or rejection of the work of experts retained by interested parties. See, *e.g., Bell v. Kirby Lumber Corp.*, 395 A.2d 730, 738-39 (Del. Ch. 1978), *aff'd in part, rev'd in part on other grounds* 413 A.2d 137 (Del. 1980), which recognized the wide latitude given appraisers in corporate merger actions to seek evidence of the value of the shares to be appraised, including the opportunity to review the appraisals of interested parties and to determine what weight they should be accorded. Here, the appraiser adequately documented his use of the two reports and the trial court could properly conclude no error resulted from the appraiser's failure to make his own valuations of Ammest's net assets.

A related sub-issue concerns the appraiser's reliance on the Smith report when, plaintiffs contend, Smith had an adverse interest. The impartiality of the appraiser is crucial and there is no contention that Harwood was not. While any bias of one upon which the court-appointed appraiser relies is of importance, it is probably sufficient that the appraiser be aware of any alleged adverse interest and evaluate that work product accordingly. Plaintiffs do not inform this court in their brief of the nature of Smith's adverse interest. In their objections to the appraisal filed in the trial court, they contended the author of the Smith report owned warrants to purchase shares of Academy stock. The appraiser referred to the prospectus in his report to the court and

was undoubtedly aware of any relationship existing between Academy and the Philo Smith Company. The stock valuation figure reported by Smith was not that different from the others computed for this litigation. Hence, there is no obvious evidence that the possession of warrants to purchase shares of Academy stock by the preparer of the Smith report improperly influenced his opinion. In addition, plaintiffs have failed to demonstrate how this fact adversely impacted the valuation picture. Therefore, plaintiffs' argument on this point is without merit.

The plaintiffs' allegations regarding the failure to value contingent assets due to past misconduct and the attribution of 60% of the value of the sales force to Ammest rather than 100% are not clearly explained in their brief. In their objections filed in the district court, they alluded to the acquisition by three individuals of the controlling interest in Academy in exchange for their controlling interest in Ammest in 1974.

The appraiser's report discloses the appraiser had knowledge of plaintiffs' contentions regarding past misconduct occurring as early as 1974, predating the merger by four years. However, the appraiser believed plaintiffs should avail themselves of other legal remedies they might have because he was not in a position to make judgments concerning past misconduct in this appraisal. Nevertheless, the appraiser did recognize the designated transactions in preparing his report "to the extent that they may have affected the reliability of the publicly reported earnings of Ammest or the usefulness of the quoted market price of Ammest's common stock as an indicator of fair market value."

Implicit in the report is the appraiser's belief that he lacked the necessary expertise to decide whether any wrongdoing had in fact occurred, and consequently, the existence of any wrongdoing was too speculative to necessitate a quantitative adjustment to the shares' value. It would appear that the trial court must have joined in this belief as well. While it has been stated in an appraisal proceeding that an appraiser may consider "the value of other [than contract rights] corporate causes of action, whether against its officers and directors or against strangers," *Mtr. of Tabulating Card Co. v. Leidesdorf,* 17 Misc. 2d 573, 574, 188 N.Y.S.2d 23 (1959), the speculative nature of the evidence presented by plaintiffs was insufficient to trigger any similar duty that may have existed in this case.

The report also reflects that the appraiser considered and concurred in the 60%/40% allocation of the sales force to the defendant companies. There was adequate support in the report for the trial court to accept the appraiser's decision and for this court, in turn, to uphold the trial court.

Plaintiffs next contend that the trial court and appraiser thwarted their attempts to discover documents (not described in their brief) which would have permitted them to submit an estimate of the value of their shares of stock. Defendants counter (1) that the refusal to obtain the documents did not constitute an abuse of discretion, (2) that plaintiffs are not entitled to discovery in appraisal actions, and (3) even if plaintiffs were entitled to discovery, they made no attempt to comply with the relevant statutes.

According to their papers filed below, plaintiffs wanted the appraiser to consider a variety of items, including, for example, all reinsurance agreements between the defendants for 1973 through 1977, and accompanying board minutes; any reports of experts retained to value the assets of Ammest Group, Inc.; board minutes concerning Academy's acquisition of Tex-Ariz stock and the defendants' merger; communications between defendants and the SEC, etc.

The trial court refused plaintiffs' discovery request at the time it appointed the appraiser and overruled plaintiffs' renewed request when it accepted the report of the appraiser. The trial court acknowledged it had considered the discovery motion, but had concluded the evidence sought would not affect the valuation. Rather, it would pertain to alleged wrongdoings prior to the merger date and plaintiffs had no remedy under K.S.A. 17-6712 with respect to such wrongdoings. Further, the production of such evidence would be unreasonable and burdensome to defendants.

K.S.A. 17-6712 applies only to appraisal proceedings brought by a corporation or shareholder who dissents from a corporate merger. The powers of the appointed appraiser conferred by K.S.A. 17-6712(e) and 60-253, by reference, include the discretionary right to examine the books and records of the corporation(s) whose stock is being valued. The appraiser is also charged to provide a reasonable opportunity to the interested parties to submit "*pertinent* evidence on the value of the shares." (Empha-

sis supplied.) K.S.A. 60-253(c) allows the appraiser to compel the production of evidence necessary to value the shares.

The report of the appraiser is then to be subjected to exceptions as to law and facts before the court. K.S.A. 17-6712(f). While the statute is silent as to the rights of the parties to compel production of evidence themselves, it seems clear that the refusal of the appraiser or the trial court to consider materials which are pertinent to the valuation would constitute an abuse of discretion.

Assuming arguendo plaintiffs had the right to discovery under K.S.A. 60-226 et seq., that right is still subject to the discretion of the trial court. K.S.A. 60-226; *Commercial Union Ins. Co. v. City of Wichita*, 217 Kan. 44, 55, 536 P.2d 54 (1975). Where a cause of action is filed under K.S.A. 17-6712, it is the court-appointed appraiser who has the power of discovery. The interested parties have the right to suggest and submit for the appraiser's consideration those documents and records they think are relevant, and then if not considered by the appraiser, for whatever reason, this refusal may be a basis for an objection to the appraisal as filed. The trial court then would be obligated to determine if the requested information was material or pertinent to the appraisal process. If the information is material, the trial court would be required to grant such request and require an amended appraisal. However, such a grant of discovery would be discretionary with the trial court to the same extent as other discovery is permitted under K.S.A. 60-226.

Here, the trial court was concerned only with the value of the plaintiffs' shares. Although plaintiffs argue that alleged past wrongdoing could positively affect the value of their stock, their discovery requests seem more relevant to an action brought for corporate misconduct and lacked sufficient specificity to convince the court that the value of the stock could not be determined without an examination of the requested materials.

Defendants' contention that plaintiffs cannot object to the rulings of the trial court because they did not avail themselves of the discovery methods authorized in K.S.A. 60-226 does not appear overly significant in view of the clear stand taken by the trial court that such discovery would not be allowed. The trial court did not err in denying plaintiffs' requested discovery.

Plaintiffs' third contention is that the trial court erroneously refused to award interest on the value of the shares as they had

requested. They believe interest should have been awarded at the prime rate. Defendants contend that awarding interest is discretionary with the trial court and that the trial court properly found interest was not justified in this case because a reasonable and bona fide dispute regarding the value of the shares existed between the parties at all material times. The trial court did provide, however, that the judgment would bear interest at the statutory rate if the amounts due were not paid into court within ten days after the filing of the journal entry.

Generally, the availability of an interest award in these cases is dependent upon the pertinent statutory provision. 19 Am. Jur. 2d, Corporations § 523. K.S.A. 17-6712(*f*) provides that the trial court "shall direct the payment of such value [of the shares], together with interest, if any, as hereinafter provided, to the stockholders entitled thereto . . . ." Similarly, subsection (*h*) mandates that the trial court, on application of any interested party, "determine the amount of interest, if any, to be paid upon the value of the stock . . . ."

In discussing subsection (*h*), Kansas Comment (8) to K.S.A. 17-6712 states that the section "makes it mandatory upon the court to determine the interest . . . ." This comment is susceptible to different interpretations as advanced here by the parties, *viz.*, the trial court must always allow interest, or the trial court must always decide whether or not interest should be awarded.

The defendants' last tender to plaintiffs to purchase the shares that may be ascertained from the record reveals a purchase price of $7.50 per share. The shares ultimately were valued at $10.01 per share, a rather significant difference.

*Universal City Studios, Inc. v. Francis I. duPont & Co.*, 334 A.2d 216 (Del. 1975), recognized that "the purpose of interest [in appraisal actions involving dissenting shareholders to a corporate merger] is to fairly compensate plaintiffs for their inability to use the money during the period in question." The court continued that the proper focus was upon "the rate of interest at which a prudent investor could have invested the money." 334 A.2d at 222. For a detailed example of the method used to arrive at the prudent investor role, see *Lebman v. National Union Elec. Corp.*, 414 A.2d 824, 829 (Del. Ch. 1980).

In *Fitzgerald v. Investors Preferred Life Ins. Co.*, 258 Ark. 966,

530 S.W.2d 195 (1975), the court considered the refusal of a trial court to award interest on the value of the dissenting shares to a merger from the merger date to the judgment date. The interpretation given the pivotal Arkansas statute is instructive here:

"Ark. Stat. Ann. § 66-4249 (Repl. 1966), provides that a dissenting stockholder ceases to be a stockholder on the date of the merger and that the surviving corporation must make a tender of the fair cash value of the dissenting stock within 30 days of the merger. Since the tender in this instance was less than the fair cash value and the merger, in effect, destroyed the stockholder's rights, simple justice would require that the assessment of ·interest from the last day of the statutory tender date to the time of judgment should be awarded. We so hold, notwithstanding the contrary holdings from other jurisdictions with similar statutory provisions. We have consistently held that in cases of conversion the defendant is liable for interest from the date of conversion, *Bradley Lumber Co. v. Hamilton,* 117 Ark. 127, 173 S.W. 848 (1915). Ark. Stat. Ann. § 66-4249 (Repl. 1966), places on the surviving corporation both the duties of determining the fair cash value and the making of a tender. To deny interest in the circumstances before us would encourage the surviving corporation to shave its estimate of fair cash value since it would have the benefit of the earnings of the money due to the dissenting stockholders during the period before judgment." 258 Ark. at 967-68.

The last sentence quoted above particularly supports plaintiffs' position. (See also *Sporborg, et al. v. City Specialty Stores,* 35 Del. Ch. 560, 123 A.2d 121 [1956], basing an award of simple interest upon the comparable Delaware statute at the going rate.)

We find that under K.S.A. 17-6712 the trial court has the discretion to determine the rate of interest to be awarded and not whether or not interest will be awarded. The amount or rate of interest to be awarded must not be less than the interest rate payable as provided by K.S.A. 16-201, which during the pendency of this action was 6% and is now 10% (1980 Supp.). The maximum rate of interest is that amount which a reasonable and prudent investor would have realized on the value of his stock as determined by the court from the statutory payment date described in K.S.A. 17-6712(*b*) until entry of judgment. Therefore, on remand the trial court is directed to enter an award of interest in light of the above principles.

Plaintiffs next argue that the Smith report prepared by Mr. Clark should not have been used because Clark held warrants to purchase over 21,000 shares of Academy stock after the merger. This contention has already been addressed under the first issue. Plaintiffs also disagree with the use of .878 of the annualized life

premium to arrive at gross values and with the valuation of certain assets of Ammest.

Defendants respond that the appraiser was disinterested and was aware of any possible bias due to Clark's ownership of the warrants, and since the appraiser's conclusions were based upon the appropriate evidence, they are valid. Viewed in this perspective, the discussion under Issue No. 1 encompasses plaintiffs' claims here as well. We have considered the evidence specified by the plaintiffs, and find their argument to be without merit.

In their fifth issue, plaintiffs contend the trial court erroneously accepted the appraiser's calculation of their stock value which included a 20% discount because they were minority shares. Plaintiffs claim there is no support for this action. They reject the appraiser's reasoning that Academy owned 53% of Ammest prior to the merger and as a result the remaining shares (including plaintiffs') would never be in control and could not reasonably expect dividends, on the basis that they had some legal remedies concerning past misconduct which could have improved their position in the company. As in several other arguments, plaintiffs seek to interject wrongdoing which seemed highly speculative and was totally disregarded by the trial court.

The appraiser explained the use of the discount in his report and again in response to a letter from the trial court. In his report, he first related use of a minority discount would be inappropriate if market value had been used to determine the stocks and value because the quoted market prices would already reflect the minority interest. However, here the asset method used represented the value of the company as a whole and that value is to be viewed as the value of a controlling interest. On the valuation date, the appraiser felt a minority block of Ammest stock was worth less per share than a controlling interest. The 20% discount reflected that the minority shareholders had no voice in company affairs.

Apparently prompted by plaintiffs' objections to the appraiser's report, the trial court inquired further concerning the justification of the discount. In a letter to the court dated November 12, 1979, the appraiser reasserted his objective was to value the shares in a manner to give the dissenters the expected equivalent if they remained stockholders of the going concern. He reiterated his original position and elaborated:

"A minority shareholder could not have expected to receive a proportionate share

of the going concern value of the assets if he had remained a stockholder of Ammest as a going concern, unless the assets as a whole, or the company as a whole, were to be sold. As a minority stockholder, he would have had no voice in a corporate policy, and no power to influence decisions as to whether to sell and, if so, when and how. The control of these decisions is an element of value (see discussion below). The appraised value of the assets represents the value of the assets as a whole. This value, divided by the number of shares outstanding, does not necessarily represent the per share value of either a minority or a controlling interest. A controlling block usually has a per share value higher than its proportionate interest, and a minority block, which does not possess the control element of value, has a lower per share value."

The parties cite no cases directly on point and we find none. Defendants attempt to justify the discount by pointing out it is merely one variable in the "weighting" of value factors.

Where it is clear that the acquisition of a minority group of stock would not result in the procurement of a controlling interest in a corporation, the value of such stock generally would reflect a lower value than if its purchase resulted in a controlling interest. Therefore, under the facts in this case, we find that the plaintiffs failed to show that the 20% minority discount was improper.

The plaintiffs' next contention is that the appraiser erred by adopting the findings of the Smith and Amos reports that 60% of the corporate sales force should be allocated to Ammest and 40% to Academy. They assert that 100% of the value should have been allocated to Ammest, thereby resulting in an increased value for their shares. Their contentions are based largely upon unsubstantiated allegations of misconduct dating back to as early as 1974. The trial court entered no specific findings on the question to reflect its thinking. It can only be assumed that the trial judge agreed with the appraiser's conclusion that the 60%/40% allocation was proper.

Plaintiffs' argument is so speculative that it is inconceivable that the trial judge could have altered the valuation of the stock based thereon. The court had substantial evidence in the record to support the allocation.

Plaintiffs also argue that the appraiser was aware of earnings of Ammest and its increased amount of life insurance in force announced in a press release for the six-month period ending June 30, 1978, but that he failed to increase his valuation figure accordingly. Plaintiffs admit that they had no data with respect to earnings from June 30 to August 31, 1978. They further claim the appraiser's report was filed long after audited financial statements

for the period were required to be filed with the SEC, yet provide no evidence that they were actually available.

Plaintiffs are entitled to the value of their stock on the effective date of the merger without respect to any increased value which may arise as a result of the merger. K.S.A. 17-6712(*b*).

In response to an inquiry of the trial court, the appraiser in a letter dated November 12, 1979, explained why he limited his valuation to the audited financial statements for the year ending December 31, 1977, used in the Smith and Amos reports. He also indicated, however, that he had examined unaudited statements for the quarters ended March 31 and June 30, 1978, and the press release to which plaintiffs refer. He reported that no audit was performed, nor was a "convention statement" required to be filed between December 31, 1977, and August 31, 1978. He related further:

"As indicated in our Report, we concluded from a review of the two companies' financial statements as published in the proxy statement (in particular, Footnote 11 to Ammest's statements) that intercompany relationships could have had material effects on the relative earnings of the two companies as reported, and that the two companies' operations were inextricably interwoven. Obviously, intercompany relationships can affect not only earnings, but also asset value.

"The Amos and Smith valuations were done on a current basis (i.e., at dates reasonably close to the dates of the audited financial statements and 'convention statements' on which they were based). We concluded that those valuations represented the best available date as to asset values at the Valuation Date. We further concluded that it was impracticable for us to attempt to reconstruct, subsequent to our appointment as appraisers in June of this year, a reliable measure of the values of Ammest's and/or Academy's assets as they stood on August 31, 1978.

"We realize that Ammest's press release reporting its earnings for the six months ended June 30, 1978 also reported an increased amount of life insurance in force at that date as compared with December 31, 1977. However, life insurance in force was not the only asset or liability of the company that changed subsequent to December 31, 1977; hence we did not believe it should be given separate consideration without also being able to determine what had happened to the values of Ammest's other assets and liabilities during that same period. As indicated above, we did not believe this could be done on a reliable basis."

We find that there was substantial competent evidence to support the trial court's approval of the appraiser's method of computation.

Plaintiffs next complain that the value of the real estate owned by Ammest was based upon its book value rather than its present value. However, they failed to proffer the requisite evidence to

the appraiser before the appraisal or to the court thereafter. These mere allegations are insufficient to find the trial court erred in approving the use of book value for the corporate realty.

Plaintiffs' final issue is closely related to issue No. 2, and apparently applies to the failure of the trial court to allow discovery after the submission of the appraiser's report and after the court obtained the appraiser's response to plaintiffs' written objections. In view of our earlier statements, we need not comment further on this issue.

The judgment is affirmed in all respects, except that the case is remanded with directions for the trial court to conduct a hearing with notice to all interested parties to determine the amount of interest to be awarded to plaintiffs for the period of time from statutory payment date to date of judgment.

Affirmed in part, reversed in part, and remanded with directions.