Mac R. PERLMAN, Sylvia Perlman, and Alan J. Pearlman, Plaintiffs,

v.

PERMONITE MANUFACTURING CO. and Midland Enterprises, Inc., Defendants.

Civ. No. H79–498.

United States District Court, N.D. Indiana, Hammond Division.

June 29, 1983.

Duane W. Hartman, Blachly, Tabor, Bozik & Hartman, Valparaiso, Ind., Robert J. Melone, Chicago, Ill., for plaintiffs.

Alan E. Lapidus, Christopher J. Horsch, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendants.

## FINDINGS OF FACT, MEMORANDUM OPINION and JUDGMENT

MOODY, District Judge.

This is an action brought under Section 23–1–5–7 of the Indiana Code to have the Court determine the value of Plaintiff's 48 shares of stock of Midland Enterprises, Inc. at the effective date of the merger of Midland into Permonite Manufacturing Company.

A bench trial was held on November 2 and 3, 1982. Defendants moved for a directed verdict at the close of the plaintiff's case, and the Court reserved ruling thereon until the close of all evidence. Based upon the pleadings of record and the evidence adduced at trial, the Court now makes the following findings:

### FINDINGS OF FACT

1. Effective July 31, 1979, Midland Enterprises, Inc., an Indiana corporation ("Midland"), and its wholly-owned subsidiary Enna Enterprises, Inc., an Illinois corporation ("Enna") were merged into Permonite Manufacturing Company, an Illinois corporation ("Permonite").

2. On July 31, 1979, plaintiffs collectively held 48 shares of the total 145 issued and outstanding shares of Midland.

3. Pursuant to Section 23–1–5–7 of the Indiana Code, plaintiffs dissented from the merger and are entitled to be paid by Permonite the value "at the effective date of the merger" of their 48 Midland shares as follows:

| | |
|---|---|
| Mac R. Perlman | 43 shares |
| Sylvia Perlman | 1 share |
| Alan J. Pearlman | 4 shares |

4. The "net asset value" approach to valuation of Midland is appropriate in this case. This assumes that Midland had a value on July 31, 1979 equal to the fair market value of its assets minus the fair market value of its liabilities. This is an assumption with which both plaintiffs' and defendants' appraisal experts concur, and it involves the preparation of an adjusted balance sheet which substitutes the fair market values of the Assets and Liabilities for their stated book values as of prior to the merger on July 31, 1979. The same process must first be computed for Enna, which was wholly-owned by Midland and thus one of Midland's assets, in order to arrive at the fair market value of Midland's investment in Enna.

5. The balance sheet of Enna as of prior to the merger on July 31, 1979, reflecting the stated book values of the Assets and Liabilities of Enna, is as follows:

ASSETS

| | |
|---|---|
| Current Assets | $ 5,274 |
| Notes Receivable | 25,185 |
| Property, Plant and Land—Net | 66,443 |
| Total Assets | $96,902 |

LIABILITIES AND STOCKHOLDERS' EQUITY

| | |
|---|---|
| Current Liabilities | $ 6,082 |
| Stockholders' Equity | 90,820 |
| Total Liabilities and Stockholders' Equity | $96,902 |

6. The balance sheet of Midland as of prior to the merger on July 31, 1979, reflecting the stated book values of the Assets and Liabilities of Midland, is as follows:

ASSETS

| | |
|---|---|
| Current Assets | $ 70,348 |
| Property, Plant and Land—net | 63,164 |
| Other Assets: | |
| Notes Receivable | 310,300 |
| Investment in Enna | 90,821 |
| Total Assets | $534,633 |

LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
|---|---|---|
| Liabilities | $ | 0 |
| Stockholders' Equity | | 534,633 |
| Total Liabilities and Stockholders' Equity | | $534,633 |

7. For purposes of substituting the fair market values of the Assets and Liabilities of Midland and Enna for their stated book values as of prior to the merger on July 31, 1979, in order to produce adjusted balance sheets for each of Midland and Enna:

(a) The Current Assets of both Midland and Enna had fair market values on July 31, 1979 equal to their stated book values ($70,348 and $5,274, respectively). The experts of both plaintiffs and defendants concur in this.

(b) The Notes Receivable held by both Midland and Enna were promissory notes and a subordinated debenture of Permonite bearing interest rates of between 6% and 10% per annum. Based on the undisputed opinion of Defendants' stock appraisal expert, the appropriate market rate of interest under the circumstances would have been 14% per annum. As a result of an agreement by Midland and Enna subordinating these notes and debenture to Permonite's loan from The Prudential Insurance Company of America, principal payment of these notes and debenture by Permonite to Midland and Enna was not anticipated until Permonite's loan from Prudential was paid in full on April 1, 1985. One of these notes held by Enna was paid by Permonite prior to the merger, but according to the undisputed testimony of Steven M. Perlman, funds for such payment were borrowed by Permonite from Midland, so that there was no net effect to either Midland or Permonite as a result of such payment. Consequently, the stated book value of these notes and debenture must be adjusted to reflect their fair market value on July 31, 1979, based upon the value on that date of the right to receive payment of the principal amount in April, 1985 with interest at a 14% per annum yield to maturity. Based on the undisputed calculation of this

value by defendants' stock appraisal expert, the Notes Receivable held by Midland and Enna had fair market values on July 31, 1979 of $223,442 and $18,423, respectively.

(c) The Property, Plant and Land of Enna (being the land and building on the south side of East Guertin Street in St. Anne, Illinois) had a fair market value on July 31, 1979 of $150,000. Neither plaintiffs nor defendants dispute this figure. However, this property was being held for sale on July 31, 1979 and was subsequently sold in a transaction which resulted in an undisputed capital gains tax in the amount of $23,600. To properly reflect the fair market value of this property on July 31, 1979 in the hands of Enna and about to be sold, the built-in incidence of this tax must be considered, and a deduction of $23,600 must be shown on the adjusted balance sheet of Enna.

(d) The current liabilities of Enna had a fair market value on July 31, 1979 equal to their stated book value ($6,082). Neither plaintiffs nor defendants dispute this figure.

(e) The fair market value of the stockholders' equity (assets minus liabilities) of Enna as of July 31, 1979, and hence the fair market value on that date of Midland's Investment in Enna for purposes of the adjusted balance sheet of Midland, was $144,015.

(f) The property, plant and land of Midland had a fair market value on July 31, 1979 of $198,000, comprised of two parcels. The first (being the land and building at the southwest corner of Lincoln and North Streets in Morocco, Indiana) had a fair market value on July 31, 1979 of $6,000. Neither plaintiffs nor defendants dispute this figure. The second (being the land and building at 490 Polk Street in Morocco, Indiana) had a fair market value on July 31, 1979 of $192,000. This is based upon the testimony of defendants' real estate expert. Plaintiffs' real estate expert testified as to a higher figure, but his appraisal is not credited by the Court as being as reliable as that of defendants' expert for the following

reasons, none of which is applicable to defendants' expert:

(1) Plaintiffs' real estate expert had never before appraised improved land anywhere in Newton County, Indiana, the county in which Morocco is located. His home and business are located in Fort Wayne, Indiana.

(2) He has never been a builder or engaged in construction other than as a passive investor.

(3) He made his site inspection and appraisal in September, 1982 and was not fully aware of the condition of the property on July 31, 1979, the effective date of the appraisal. Capital improvements in the amount of $242,626 had been made in the interim period, significant portions of which he assumed were made prior to July 31, 1979, and he was not fully aware of the details of these improvements. He had not seen photographs taken prior to these improvements.

(4) In his cost approach to valuation, he used replacement cost, instead of reproduction cost, and applied functional obsolescence to the replacement cost. These practices are not applicable in this case. By using replacement cost instead of reproduction cost, he assumed that the building had been destroyed and would be replaced with a more modern and functional building. Thus, he was valuing a building which was not actually there, rather than determining the reproduction cost of the building which was there.

(5) Using the Marshall Valuation Service to determine estimated reconstruction costs, he assumed that the building was of "average cost" when "low cost" would have been more appropriate, based on the description of the building and its condition on July 31, 1979.

(6) In his cost approach to valuation, he did not specify, cost or depreciate site improvements and offered no explanation for this $40,000 component of the cost approach.

(7) He did not calculate a value based on the income approach to valuation as is generally required under accepted appraisal standards, and thus was unable to corroborate his other calculations and his assumptions.

(g) The fair market value of the Stockholders' equity (assets minus liabilities) of Midland as of July 31, 1979 was $635,805.

8. The adjusted balance sheet of Enna as of prior to the merger on July 31, 1979, substituting the fair market value of the Assets and Liabilities for their stated book values in accordance with paragraph 7 above, is as follows:

ASSETS

| | |
|---|---|
| Current Assets | $ 5,274 |
| Notes Receivable | 18,423 |
| Property, Plant and Land—Net | 150,000 |
| (Less capital gains tax) | (23,600) |
| Total Assets | $150,097 |

LIABILITIES AND STOCKHOLDERS' EQUITY

| | |
|---|---|
| Current Liabilities | $ 6,082 |
| Stockholders' Equity | 144,015 |
| Total Liabilities and Stockholders' Equity | $150,097 |

9. The adjusted balance sheet of Midland as of prior to the merger on July 31, 1979, substituting the fair market values of the assets and liabilities for their stated book values in accordance with paragraph 7 above, is as follows:

ASSETS

| | |
|---|---|
| Current Assets | $ 70,348 |
| Property, plant and land—net | 198,000 |
| Other assets: | |
| Notes Receivable | 223,442 |
| Investment in Enna | 144,015 |
| Total Assets | $635,805 |

LIABILITIES AND STOCKHOLDERS' EQUITY

| | |
|---|---|
| Liabilities | $ 0 |
| Stockholders' Equity | 635,805 |
| Total Liabilities and Stockholders' Equity | $635,805 |

10. Plaintiffs' percentage (or prorata) interest in the adjusted Stockholders' Equi-

ty of Midland is 33.1% or $210,451. Plaintiffs held a minority interest in Midland.

11. Discounts are customary and necessary under these circumstances to convert plaintiffs' prorata interest in the adjusted stockholders' equity of Midland into the fair market value of plaintiffs' 48 Midland shares. Midland was a relatively small, closely held, non-publicly traded corporation; the holders of a minority interest in Midland (such as the minority interest held by plaintiffs) cannot force a liquidation, they cannot force a dividend and they cannot dictate or control corporate policy and operations. They have no real market for their shares. Further, Midland's business is concentrated in a small number of holdings and it essentially has only one customer—Permonite. Such factors must be, and customarily are, considered in determining the fair market value of a minority interest in a corporation such as Midland. In this case, the application of a .35% discount is necessary, the elements of which are 15% to reflect that plaintiffs' shares represent a minority interest, 15% to reflect that there is virtually no market for plaintiffs' shares, and 5% to reflect that there is a particular risk associated with holding Midland shares because of Midland's size and lack of diversity. The amount of this discount is based upon the undisputed testimony of defendants' stock appraisal expert. Plaintiffs' appraisal expert did not compute such a discount, but readily acknowledged that such a computation would be appropriate in determining the fair market value of plaintiffs' 48 Midland shares and that the percentage of such discounts could be substantially higher than 35%.

12. The fair market value of plaintiffs' 48 Midland shares as of prior to the merger on July 31, 1979 was $136,793, or $2,849.85 per share.

13. The testimony of plaintiff Mac R. Perlman as to the value of plaintiffs' 48 Midland shares is not credited by the Court as being reliable. The testimony of both parties' experts, including his own, contradicts it.

14. Even if the value of Permonite shares was relevant under applicable law, there is no reliable testimony in the record as to the value of such Permonite shares. The one arm's length fair market valuation with the Internal Revenue Service in connection with the estate of Morris Perlman as of November 20, 1979 (less than four months after the merger), would, through the merger exchange rate of 25 Permonite shares for each Midland share, cause a value to be placed on plaintiffs' 48 Midland shares of $108,744 (or $2,265.50 per share). The sale of Permonite shares to Gary White in June, 1978 (thirteen months prior to the merger) for $425 per share was not an arm's length transaction (as is reflected in the minutes of the meeting of the Board of Directors of Permonite held on June 13, 1978) and it is not nearly as indicative of the fair market value of Permonite shares on July 31, 1979 as is the Internal Revenue Service valuation as of November 20, 1979.

## DISCUSSION AND CONCLUSIONS OF LAW

Plaintiffs Mac R. Perlman, Sylvia Perlman and Alan J. Pearlman, former shareholders of Midland Enterprises, Inc., (Midland) brought this action pursuant to Ind. Code Ann. § 23–1–5–7 (Burns), following their dissent from the merger of Midland and its wholly owned subsidiary, Enna Enterprises, Inc., into Permonite Manufacturing Company (Permonite). Ind.Code § 23–1–5–7 provides that upon proper notice a shareholder who dissents from a merger of his corporation may obtain "the value of such shares at the effective date of the merger...." Where the shareholder and the new corporation cannot agree on the value of the dissenters' shares, the statute further provides that the dissenters may bring an action in court for an appraisal of the value of the dissenting shares. That is exactly the type of action which has been brought here and hence, the duty of this Court is to determine the value of the plaintiffs' shares as of the date of the merger of Midland (and Enna) into Permonite. The Court has made the required determination in the above findings of fact. In doing so,

the Court addresses the following issues of law presented by the parties:

(1) Whether the Court has subject matter jurisdiction over the claim of Sylvia Perlman;

(2) Whether the Court may consider any increase in the value of plaintiffs' shares resulting from the merger;

(3) Whether the Court may discount the value of the plaintiffs' shares due to the fact that they represent a minority interest;

(4) Whether the Court may discount the value of the dissenting shares for the reason that there is virtually no market for the dissenting shares;

(5) Whether the Court may discount the value of the dissenting shares due to the fact that Midland was a nondiverse corporation;

(6) Whether the Court may discount the value of the plaintiffs' shares due to potential liability for capital gains taxes;

(7) Whether the value of the Permonite shares is relevant to the Court's determination of the value of the plaintiffs' shares;

(8) Whether the plaintiffs are entitled to prejudgment interest on the value of their shares from the date of the merger.

The first issue presented here is whether the Court has subject matter jurisdiction over the claim of Sylvia Perlman. Jurisdiction in this case is based on diversity of citizenship. Of course, in addition to the requirement of complete diversity of citizenship, the plaintiffs must also allege that the matter in controversy exceeds ten thousand dollars. 28 U.S.C. § 1332. In their closing argument, defendants contend that Sylvia Perlman, who alleges that she owned one share of Midland, did not meet the jurisdictional amount requirement in that the evidence at trial viewed in a light most favorable to the plaintiffs reveals that one share of Midland was worth little more than six thousand dollars at the time of

Midland's merger into Permonite.[1] Defendants conclude, then, that Sylvia Perlman's claim should be dismissed for lack of subject matter jurisdiction. Defendants' argument is without merit.

Where there are several plaintiffs in a diversity action, each alleging a separate and independent claim, each plaintiff must individually satisfy the jurisdictional minimum amount requirement. *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). The amount in controversy is decided from the complaint itself "unless it appears or is in some way shown that the amount stated in the complaint is not claimed 'in good faith'." *Horton v. Liberty Mutual Insurance Co.,* 367 U.S. 348, 353, 81 S.Ct. 1570, 1573, 6 L.Ed.2d 890 (1961). In order to find that the jurisdictional minimum is not claimed in good faith, it "must appear to a legal certainty that the claim is really for less than the jurisdictional amount...." *St. Paul Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1937). Where the jurisdictional minimum is claimed but not recovered, the jurisdiction of the court is not ousted. *Gordon v. Longest,* 41 U.S. (16 Pet.) 97, 10 L.Ed. 900 (1842). Having considered the relevant law on this matter, the Court concludes that it has jurisdiction over the claim of Sylvia Perlman.

The Court has jurisdiction over the claim of Sylvia Perlman because it finds that Sylvia Perlman alleged the jurisdictional minimum in good faith. The plaintiffs' complaint asserted generally "that the matter in controversy exceeds the sum of Ten Thousand Dollars ($10,000.00), exclusive of interest and costs" and "that jurisdiction exists on the basis of diversity of citizenship and the jurisdictional amount." Plaintiff Mac Perlman testified at trial to a value per share of Midland of $10,625. This is based on a 1978 sale of Permonite stock at $425.00 per share and an exchange rate at the time of the merger of 25 Permonite shares for one Midland share. The fact that this evidence may or may not be rele-

---

[1.] This estimate is based on the testimony of the plaintiffs' expert appraiser.

vant or carry any weight if relevant in the Court's ultimate determination of value or that plaintiffs' own expert later appraised the value of Sylvia Perlman's stock at a figure well under ten thousand dollars does not indicate that the plaintiff's assertion in her complaint that her claim exceeded the jurisdictional amount was made in bad faith. Based on the exchange rate of Permonite stock for Midland stock and the 1978 sale price of Permonite stock, the Court finds that it does not appear to a legal certainty that Sylvia Perlman's claim was not made in good faith. The Court therefore concludes that it has jurisdiction over all of the claims made by the plaintiffs in this action.

Having decided the jurisdictional question presented here, the remaining issues deal with how the Court must determine the amounts to be recovered by the plaintiffs for their shares of stock. These issues in turn merit some fairly detailed discussion of two Indiana cases dealing with the determination of the value of dissenting shareholders' stock: *Republic Finance Investment Co. v. Fenstermaker,* 211 Ind. 251, 6 N.E.2d 541 (1937) and *General Grain, Inc. v. Goodrich,* 140 Ind.App. 100, 221 N.E.2d 696 (1966).

In *Republic Finance,* dissenting shareholders brought an action under the statute controlling here to have their shares evaluated when their company was consolidated with a second corporation. Republic Finance appealed the trial court's determination of value and argued generally that in finding the value of the merged corporation's assets, the trial court relied too heavily on the book value of those assets and ignored estimates of value submitted by Republic Finance. The Indiana Supreme Court held that the value of dissenting shares of stock must be based on consideration of all relevant factors. The court stated:

It is also contended that the court took book value alone as the basis for the determination of value, and that book value is not a proper basis. In connection with this contention, it is said that, in fixing value, weight should be given to the following considerations: Market value of stock, actual evaluation of assets, book value of assets, going value, prospects of corporation, character of assets (frozen or liquid), earnings, and general economic conditions.

6 N.E.2d at 542. In *Republic Finance,* the asset value of the corporation was given great emphasis by the trial court and hence, by the state supreme court. The supreme court further delineated the considerations used in determining asset value and held that where the corporation was not in distress or in immediate danger of liquidation, such value should be arrived at by looking at the corporation as a going concern and not by looking at the liquidation value of the assets. The court continued:

What is meant by 'actual evaluation of assets' is not clear. The book value may or may not give assistance, depending upon the method by which the books are kept. The statement of assets and liabilities introduced by [the shareholders] is shown to have been based on appraisals, and therefore is of more value than a statement based upon arbitrary figures, such as costs and arbitrary percentage reserves. Good will or going value should be given consideration if the concern is a going concern and in a position to continue its business. Earnings and general economic conditions are proper elements to consider, and there may be other elements that tend to indicate value, and, if so, they should be considered. In other words, in the appraisal of assets, every fact brought forward which has a tendency to indicate value should be taken into consideration.

*Id.* However, any increase or decrease in value of stock resulting from the merger should not be considered in appraising the value of dissenting shares:

Appellants [Republic Finance] contend that the cost of the merger should have been deducted from the value, but it would seem that, as to one who dissents and does not desire to be a party to the merger, this is not true. The value as to

him is fixed as of before the merger. He should not be given advantage of any increased value which may, in the opinion of the appraisers, result from the merger, nor should he be charged with the expense of bringing about the merger.

*Id.* at 542–43. The judgment of the trial court as to the value of the dissenting shares was affirmed since the evidence as to value was conflicting and since there was no showing that the trial court considered incorrect factors or failed to consider all of the relevant factors.

Further enlightenment as to the valuation of dissenting shares of stock was provided by the Indiana Appellate Court in *General Grain, Inc. v. Goodrich, supra.* As in *Republic Finance,* the plaintiffs in *General Grain* brought an action for the valuation of their shares when they dissented from a merger. The defendant-company appealed, claiming that the jury award was excessive. The appellate court stated that the exclusive determination to be made in a stock valuation case is the "fair market value" of the stock. 221 N.E.2d at 701. This determination involves consideration of many factors:

> While the different elements of value, such as book value, liquidating value, stock market value, evidence of sales in the market, the type of market available, the condition of the issues financial, managerial, (and) past and their present, as well as future possibilities and probabilities together with all the other elements which tend to affect the fair market value, for cash, of course, are worthy of consideration, such consideration could lawfully be and should have been limited in their application to the single and exclusive and final purpose of finding and deciding the fair market value to which appellees and appellants were entitled to have adjudicated.

*Id.* The appellate court went on to discuss valuation based on prices in the stock market and concluded that with all the factors affecting the stock market, "no one or no group, especially a court or a jury safely can rely upon the market *alone* to deter-mine the fair market value of a particular security on any given day." *Id.* at 702. This is especially true where there is little evidence as to stock market sales or where the sales are not sufficiently close to the date of merger, and in such a case such evidence cannot "do any more than furnish evidence for consideration by the jury in arriving at the fair market value of the [shares] in question on the merger date." *Id.* The financial condition of the merged corporation was also a proper subject of inquiry in determining the fair market value of its stock. The corporation in *General Grain* had financial troubles, and the appellate court found that the trial court's instructions to the jury placed undue weight on the book value or liquidating value of the corporation's stock, which value was the subject of what the appellate court termed unsound "adjustments." *Id.* The court held:

> No more inaccurate method possibly could have been employed by the jury in calculating its verdict than that of taking the book value or liquidating value of the stock, as reflected in the financial records of the corporation as a starting point. These records were fictional, and no good purpose was served by the use of them without prior adjustment to the facts as they were shown to have existed.

*Id.* Having found that the trial court placed too much emphasis on the "value" of the corporation stock as shown in the corporation books, the appellate court concluded that the trial court judgment was not based "solely and exclusively upon the fair market value of appellees' securities which they did not wish to subject to the merger" and therefore reversed the trial court judgment. *Id.* at 702–03.

Following this review of Indiana state law, it now becomes necessary to deal with the several issues presented here concerning the value of the plaintiffs' stock. These issues will be dealt with in the order they are listed above.

The first valuation issue is whether the Court may consider evidence of any increase in value of the plaintiffs' stock

resulting from the merger. Plaintiffs' appraisal expert John Van Blarcum, testified that he was hired by the plaintiffs to determine the value of the Midland corporation. In completing his task, Van Blarcum used an approach in which he valued the assets of Midland and its subsidiary, Enna. Valuation of some of the assets was done based on his understanding of the Midland-Permonite merger agreement. For example, Van Blarcum did not apply a discount to certain notes receivable owing from Permonite to Midland and Enna because the merger agreement provided that the notes would be retired at face value in the merger. Van Blarcum readily admitted, however, that if he had not considered the merger agreement, some discount would have been applied to the notes. Van Blarcum further testified that he did not apply any discounts for minority interest or for lack of marketability for plaintiffs' shares because (a) he was hired to value the corporation and not the shares and (b) the merger agreement provided a willing buyer for the plaintiffs' stock.

The Court concludes that consideration of the merger agreement by plaintiffs' expert was improper in light of the holding in *Republic Finance* that the value of dissenting shares of stock must be fixed as of before the merger without any "advantage of any increased value which may . . . result from the merger. . . ." 6 N.E.2d at 543.[2] Plaintiffs argue that consideration of the provisions of the merger agreement is proper because a court must look at all relevant factors affecting fair market value of the stock. The short answer to this is that, where the fair market value is to be determined at a point just before the merger, the provisions of the merger agreement are not relevant to a determination of that value. Since plaintiffs' expert considered the merger arrangement in making his appraisal, that appraisal must be accorded less weight than it might otherwise deserve. On the other hand, defendants' appraisal expert, David Downen, testified that in

making his appraisal he did not consider the merger agreement or any of the provisions therein. The Court concludes that this was proper under the *Republic Finance* holding and Downen's opinion must be given greater weight.

■ The next issue is whether the court may apply discounts on the value of plaintiffs' shares because they represent a minority interest in Midland, because they lack marketability and because Midland was a nondiverse company. Defendants argue that such discounts affect fair market value and should therefore be considered. For example, a discount should be applied to a minority interest because a minority interest cannot force a liquidation, block a merger, force a sale of corporate assets, or dictate corporate policy. Hence, its fair market value is less than that of a majority interest. Although neither party cites any relevant case law on whether such a discount is proper, the Court has located two cases dealing with the issue.

The first case on the issue of minority discounts is *Woodward v. Quigley,* Iowa, 257 Iowa 1077, 133 N.W.2d 38 (1965). In that case, the court rejected the application of a minority discount or of a brokerage fee to the value of dissenting shares:

> The majority was given the right to continue the corporation in return for the payment to the minority of its fair share of the real value of the corporation. It is contrary to the purpose of the [Iowa appraisal] statute to discount the minority interest because it is a minority. This in effect would let the majority force the minority out without paying it its fair share of the value of the corporation.

*Id.* at 43. The *Woodward* court further rejected an analogy to tax cases where discounts for the lack of marketability of a minority interest are considered important in evaluating stock interest for tax purposes:

---

**2.** Other courts agree that stock value may not be adjusted by any increases resulting from the merger. *See Moore v. New Ammest, Inc.,* Kan.

App., 6 Kan.App.2d 461, 630 P.2d 167 (1981) and cases cited at 48 A.L.R.3d 430, 442–47 (1973).

There is no doubt that the market value of such minority interest is less than the average value per share of the stock or that a majority interest is worth more. In considering the value for tax purposes it is proper and necessary to discount the value because it is a minority interest. The statutory interest afforded the minority interest in cases of the kind here involved distinguishes this case from the tax cases. As we have stated above, the statute is designed to protect the minority from the very considerations which result in a discounted value in the tax cases. By statute the minority is guaranteed the 'real' value of its stock.

*Id.* at 44. Thus, in determining the "real" value of dissenting shares in Iowa, no discounts for a minority interest are applied.

Opposing the view announced in *Woodward* is that of the court in *Moore v. New Ammest, Inc.,* Kan.App., 6 Kan.App.2d 461, 630 P.2d 167 (1981). The court in *Moore* noted that Kansas law required that the "value" of a dissenting shareholder's stock be based on all relevant factors and that "value" was equal to the dissenting stockholder's proportionate interest in a going concern. The Kansas court then found the application of a twenty per cent minority discount appropriate:

> The appraiser explained the use of the discount in his report and again in response to a letter from the trial court. In his report, he first related use of a minority discount would be inappropriate if market value had been used to determine the value because the quoted market prices would already reflect the minority interest. However, here the asset method used represented the value of the company as a whole and that value is to be viewed as the value of a controlling interest. On the valuation date, the appraiser felt a minority block of Ammest stock was worth less per share than a controlling interest. The 20% discount reflected that the minority shareholders had no voice in company affairs.

*Id.* at 177. The court further quoted the appraiser:

> 'A minority shareholder could not have expected to receive a proportionate share of the going concern value of the assets if he had remained a stockholder of Ammest as a going concern, unless the assets as a whole, or the company as a whole, were to be sold. As a minority shareholder, he would have had no voice in a corporate policy, and no power to influence decisions as to whether to sell and, if so, when and how. The control of these decisions is an element of value.... The appraised value of the assets represents the value of the assets as a whole. This value, divided by the number of shares outstanding, does not necessarily represent the per share value of either a minority or a controlling interest. A controlling block usually has a per share value higher than its proportionate interest, and a minority block, which does not possess the control element of value, has a lower per share value.'

*Id.* The *Moore* court then concluded that the shareholders failed to show that the twenty per cent minority discount was improper.

This Court has studied both the *Woodward* and the *Moore* decisions and finds the *Moore* rationale to be more in line with Indiana law as announced in the *Republic Finance* and *General Grain* cases. As held in *General Grain,* the exclusive duty of this Court under Indiana law is to find the fair market value of the plaintiffs' shares of Midland stock. The Court should not simply find the plaintiffs' pro rata share of the asset value of Midland. Certainly the plaintiffs' pro rata share of the Midland assets is a relevant factor to be considered in determining the fair market value of the plaintiffs' shares, but that figure, standing alone, is merely a starting point. In order to complete the task of finding the fair market value of the plaintiffs' shares, the Court must adjust the pro rata figure by using other relevant factors brought to its attention such as the fact that the plaintiffs' shares represent a minority interest of Midland, or that the plaintiffs' shares lack marketability, or that Midland is a nondiverse company. The Court finds all of

these factors to be relevant in determining the fair market value of the plaintiffs' stock. The importance of these discounts was acknowledged by the plaintiffs' stock appraisal expert who testified on cross-examination that if he had been asked to value the plaintiffs' forty-eight shares rather than value Midland itself, certain discounts would have been appropriate. Furthermore, plaintiffs' expert stated that a discount for up to seventy per cent for lack of marketability or up to ninety per cent for a minority interest might be appropriate. This substantiates the application by defendants' expert of fifteen per cent discounts for each of these factors. Defendants' expert also applied a five per cent discount to the fair market value of plaintiffs' shares because Midland's business was nondiverse and consisted solely of ownership of property used by Permonite. Defendants' expert testified that the five per cent discount was conservative and plaintiffs' do not challenge his estimate. In conclusion, the Court finds the discounts for minority interest, lack of marketability and lack of diversity applied by defendants' expert to be proper.

Although discounts for minority interest, lack of marketability and lack of diversity are proper, a discount for capital gains tax liability is not. Defendants' appraisal expert maintained that a five per cent trapped capital gain should be discounted to determine the fair market value of the plaintiffs' shares because the fair market value of the Midland assets are greater than their book value. Thus, if the assets were sold, capital gains tax would have to be paid. Defendants' claim that a discount for this capital gains tax should apply to the plaintiffs' pro rata share of the Midland assets to arrive at the fair market value of the plaintiffs' shares. Defendants' argument is without merit.

Application of a capital gains discount assumes liquidation of the appreciated assets. In determining the net asset value of Midland as a whole, however, liquidation value of the assets is not the correct focus. Rather, the decision in *Republic Finance* points out that the corporate assets must be valued in the context of the corporation as a going concern, unless the corporation is in distress and liquidation inevitable. 6 N.E.2d at 542. Thus, where the corporation is not in danger of liquidation, a fictional liquidation is not the basis for the evaluation of the corporate assets. As noted above, capital gains tax would only arise in the case of a liquidation. Since liquidation was not imminent here, a discount for capital gains tax should not be considered. In addition, were the Court to discount the value of plaintiffs' shares due to capital gains tax liability, the benefit in this case would only accrue to the majority stockholders and Permonite. This result is inequitable when one recognizes that if the Midland assets were to be liquidated, both minority and majority shareholders alike would be affected by the capital gains tax. In applying his capital gains discount, defendants' expert did not say whether or not his percentage discount was pro rated among all of the stockholders. If the discount is not so pro rated, all of the capital gains tax liability would rest on the minority shareholders here, a result which this Court finds unacceptable.[3]

The next issue is whether the value of Permonite shares is relevant to the determination of the fair market value of plaintiffs' Midland shares. Plaintiffs' first witness, Mac Perlman, testified that shares of Permonite stock were offered to an employee of Permonite, one Gary White, for a price of $425.00 per share in the summer of 1978. One year later, at the time of the merger at issue here, twenty-five shares of Permonite stock were said to be equal to

---

**3.** The Court earlier approved a capital gains deduction from the St. Anne property when affirming the asset value estimations made by defendants' stock appraisal expert for Enna Enterprises. This deduction was approved because the St. Anne property was for sale at the time of the merger and was eventually sold, the capital gains tax being paid by Permonite. Hence, since the liquidation of the St. Anne property was planned at the time of the merger, a discount for the "trapped" capital gains tax was proper.

one share of Midland stock. Mac Perlman then opined that the fair market value of the plaintiffs' Midland stock should be twenty-five times $425, or $10,625 per share.

There is no doubt that examples of prior sales of Midland stock would be relevant evidence for the Court to consider in determining the fair market value of the plaintiffs' Midland stock. This is shown by the holdings of *Republic Finance* and *General Grain* which both recognize stock market values as relevant considerations. Whether evidence of sales of another corporation's stock is relevant is another question. The Court need not decide here, however, whether such evidence is relevant for the Court finds that even if it is assumed that sales of Permonite stock are relevant, the weight to be accorded the evidence here is at most negligible. The sale of Permonite stock testified to by Mac Perlman was to an employee of Permonite who, at the time he purchased the stock was to be promoted, made an officer of the corporation, and elected to a position on the Permonite directorate. *See* Plaintiffs' Exhibit Number 8. It is obvious that these factors played an important part in the decision of the Permonite board to approve the sale of the stock at the price stated. For this reason, the transaction testified to was hardly an "arm's length" sale. Moreover, the sale of the Permonite shares occurred about one year before the Midland-Permonite merger. Utilization of the sale price in 1978 together with an exchange rate established for purposes of a merger taking place over one year later, hardly gives this Court an accurate picture of the fair market value of Midland stock on July 31, 1979. Finally, the sale testified to by Mac Perlman was an isolated sale and the plaintiffs presented no evidence of other sales of Permonite stock for this Court to use in comparison. For these reasons, the Court finds that, assuming that evidence of the sale of Permonite stock is relevant here, it carries almost no weight in the Court's decision as to the fair market value of the plaintiffs' Midland stock.

The last issue presented is whether the plaintiffs are entitled to prejudgment interest on the value of their Midland stock from the date of the merger. The appraisal statute, § 23–1–5–7, does not expressly provide for interest. The plaintiffs argue, however, that to deny dissenting shareholders interest would be unjust in that the appraisal statute already denies them the right to participate in dividends or in corporate management from the date of the merger. Plaintiffs further argue that they are entitled to interest because the relevant eminent domain statute, Ind.Code Ann. § 32–11–1–8 (Burns) provides for the recovery of interest from the date of taking [4] and § 23–1–5–7 states that the "practice, procedure and judgment" in stock valuation cases "shall be the same, so far as practicable, as that in eminent domain cases."

In opposition to the award of interest, defendants refer the Court to the *General Grain* case. The *General Grain* decision was issued in 1966 and dealt with a merger which took place in 1958. The trial court in that case awarded the stockholders six per cent interest on the value of their shares from the date of the merger. The court of appeals reversed. The appellate court noted that the Indiana eminent domain laws were passed in 1905 and that the stock appraisal statute was enacted as part of the Indiana General Corporation Act in 1929. At the time the appraisal statute was enacted, the eminent domain laws did not provide for interest from the date of the taking although Indiana courts had long recognized the propriety of such an interest award. In 1965, the eminent domain laws were amended and one of those statutes, § 32–11–1–8, now provides for the payment of interest from the date of taking. The *General Grain* court held, first of all, that

---

**4.** § 32–11–1–8 (Burns, 1980 Repl.) reads in relevant part:

In any trial of exceptions, the court or jury shall compute and allow interest at the rate of eight percent (8%) per annum on the amount of a defendant's damages from the date plaintiff takes possession of the property . . . .

Indiana case law could not be interpreted as part of the "practice, procedure and judgment" of the eminent domain laws, so as to be adopted by the appraisal statute, since the original eminent domain laws did not provide for interest from the date of taking. 221 N.E.2d at 700. Moreover, the *General Grain* court further found that a serious question existed as to whether the payment of interest could be characterized as part of the "practice, procedure and judgment" of the eminent domain laws so as to be applicable to stock valuation cases since the right to interest is more in the nature of a substantive right than a procedural right. Thus, the court concluded that "like any other unliquidated claim, appellees are not entitled to interest either under the common or statutory law as the court finds them to be until final judgment in the matter...." *Id.* at 701.

The plaintiffs attempt to distinguish the *General Grain* case by pointing out that the merger there occurred in 1958—seven years before the eminent domain laws were amended to provide for the payment of prejudgment interest. Thus, the 1965 prejudgment interest amendment would not apply in that case. Plaintiffs argue that it is for this reason that the court in *General Grain* needed only to reject the case law, which had always provided for interest in eminent domain proceedings, by holding that it could not be adopted by the stock appraisal statute as the "practice, procedure and judgment" of the eminent domain laws. The argument continues: if the *General Grain* court found the 1965 prejudgment interest amendment to have retroactive application in that case, it would have applied the amendment and there would have been no need to look at Indiana case law. So far as the plaintiffs' argument goes, it may have some merit. However, plaintiffs fail to recognize that the court also found "a serious question" as to whether the right to

interest was part of the "practice, procedure and judgment" of the eminent domain laws. This is for the reason that a right to interest was more in the nature of a substantive right than a procedural one.[5] If interest were a substantive right, it would not be part of the "practice, procedure and judgment" of the eminent domain laws and would not be adopted by the stock appraisal statute. Plaintiffs' efforts to distinguish *General Grain* on the ground stated is therefore to no avail.

There is also a stronger ground for finding the *General Grain* holding controlling in this case. The *General Grain* court pointed out the inequities created where a dissenting shareholder was deprived of his right to participate in corporate affairs and share dividends and of his right to collect interest. Even so, the court went on to state:

> This glaring injustice of the Indiana [General Corporation] Act is a matter for the General Assembly, but this court should not concern itself with either the expediency nor need for corrective legislation. The court is charged with the responsibility to interpret and construe legislative enactments, and it is beyond the power of the court to legislate by judicial fiat.

*Id.* at 701. Despite the court's express invitation to the Indiana Legislature to add an interest provision to the stock appraisal statute, the statute has twice been amended since the *General Grain* decision, with no mention of post-merger interest. Given the assumption that the Legislature is acquainted with existing case law, *see State v. Young,* 246 Ind. 52, 199 N.E.2d 694 (1964) and the general rule that where "an amendment leaves certain portions of the original act unchanged, such portions are continued in force, with the same meaning and effect they had before the amendment," 82 *C.J.S.* Statutes § 384(a), this Court can only conclude that the Indiana Legislature has in-

---

5. The idea that the right to interest is a substantive right rather than a procedural right finds support in the pre-1965 amendment eminent domain cases. In those cases, interest was awarded in eminent domain proceedings from the date of taking on the ground that it

was required as part of the substantive right to just compensation for the taking of property under the Indiana Constitution, Art. 1, § 21. *Schnull v. Indianapolis Union Railway Co.,* 190 Ind. 572, 131 N.E. 51 (1921).

tended to let the *General Grain* decision stand insofar as it holds that the stock appraisal statute, § 23–1–5–7, does not provide for the recovery of prejudgment/post-merger interest by dissenting shareholders. Plaintiffs' argument that they are entitled to such interest is rejected.[6]

The defendants moved for a directed verdict at the close of the plaintiffs' evidence. The Court reserved its ruling on that motion until after the presentation of all of the evidence. Since this case was tried before the bench and not a jury, defendants' motion is more properly viewed as one for involuntary dismissal under Fed.R. Civ.P. 41(b). 5A *Moore's Federal Practice* ¶ 50.03[1] (1982). A motion for involuntary dismissal may only be granted where the Court finds that "upon the facts and the law the plaintiff has shown no right to relief." Fed.R.Civ.P. 41(b). Defendants contend that such a finding would be proper in this case because the plaintiffs presented no evidence as to the fair market value of their shares because their expert merely testified as to the plaintiffs' pro rata portion of the total net asset value of Midland. While this may or may not be direct evidence of the fair market value of the plaintiffs' shares, it is certainly probative of the Court's determination of that value, in light of Indiana law that all relevant factors should be considered. Hence, the Court cannot agree that the plaintiffs showed no right to relief. Defendants' motion for involuntary dismissal raised at the close of plaintiff's case-in-chief is denied.

## JUDGMENT

(1) Defendants' motion for an involuntary dismissal is denied;

(2) The value of the plaintiffs' stock is $2,849.85 per share;

(3) Plaintiffs are entitled to judgment in their favor against the defendants as follows:

| | |
|---|---|
| Mac R. Perlman | $122,543.55 |
| (43 shares × $2,849.85) | |
| Alan J. Pearlman | $ 11,399.40 |
| (4 shares × $2,849.85) | |
| Sylvia Perlman | $ 2,849.85 |
| (1 share × $2,849.85); | |

(4) Defendants shall pay the above amounts to the plaintiffs within 60 days after entry of this judgment by the Clerk of the Court, which payment shall be made against delivery to the defendants of the plaintiffs' Midland stock certificates, duly endorsed for transfer;

(5) Each party shall bear its own costs in this matter.

---

6. Plaintiffs also argue that they are entitled to prejudgment/post-merger interest as part of the just compensation for the taking of their property as guaranteed by the United States Constitution, Amendment 14 and by the Indiana Constitution, Art. 1, § 21. The plaintiffs' contention is devoid of any supporting authority or argument and therefore is found to be meritless.