INSTITUTIONAL EQUIPMENT AND INTERIORS, INC., Plaintiff-Appellant, v. MURIEL GRACE HUGHES, Ex'r of the Estate of Norman J. Diebolt, Defendant-Appellee.

Second District    No. 2—90—0004

■

Opinion filed October 25, 1990.

John M. Touhy and Anthony Hong, both of Mayer, Brown & Platt, of Chicago (Michele Odorizzi, of counsel), for appellant.

William J. McGrath, of McGrath, Harty & McGrath, of Wheaton, and Hughes & Hughes, P.C., of Grosse Pointe, Michigan (John J. Hughes, of counsel), for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Plaintiff, Institutional Equipment & Interiors, Inc., appeals from a judgment in which the circuit court found that, on August 20, 1984, the fair value of stock in plaintiff's corporation held by the estate of Norman J. Diebolt (Muriel G. Hughes, executor), was $430 per share. On appeal, plaintiff argues that the trial court's determination of the stock's per share value was erroneous.

Plaintiff was incorporated in Illinois in 1965. Its primary business is designing, installing, and decorating restaurant and cafeteria interiors. Plaintiff also fabricates stainless steel fixtures and supplies small wares required for the operation of restaurants and cafeterias.

Plaintiff had three founding shareholders: Norman Diebolt (Diebolt) (1,400 shares), Ben Freed (Freed) (1,400 shares), and Harry Shiffer (Shiffer) (700 shares). Each paid $10 per share and lent the corporation substantial funds, which were carried for a number of years. Diebolt was the president and principal executive officer until his death in 1984. Freed was chairman of the board, and Shiffer was the executive vice-president.

From the outset, plaintiff's largest single customer was Piccadilly Cafeterias, Inc. (Piccadilly), the owner and operator of a chain of cafeterias (93 units as of June 30, 1984), located in the southern United States. Piccadilly hired plaintiff to design and install the interiors of most of the new cafeterias it opened after 1965. The Piccadilly busi-

ness accounted for approximately 60% of plaintiff's sales during the period from 1976 through 1984. Contracts with Piccadilly were always made on a project-by-project basis; plaintiff never had a contractual right to expect any particular level of sales from Piccadilly. When plaintiff was formed, Piccadilly purchased 50% of its stock (3,500 shares) for $35,000. Piccadilly did not participate in the management of the company, leaving that task entirely in the hands of the three individual shareholders.

In 1980, Diebolt, who was the driving force behind the company, was 84, Freed was 70, and Shiffer was 77. With no obvious successors to either Diebolt or Freed, the shareholders discussed the possibility of selling the company. Nothing had come of these discussions by 1981, when Shiffer died. At that point, plaintiff's stock had a book value of $194.56 per share. The Shiffer estate was unable to find an outside purchaser for the stock. In 1982, Shiffer's 700 shares were sold to Diebolt for $21,000 or $30 per share. Diebolt then sold half of Shiffer's stock to Freed, making both of them 25% owners of the corporation.

Despite continuing efforts to sell the company, no offers had been made by the time Diebolt died on March 12, 1984. After Diebolt's death, efforts to find a buyer intensified. Although Piccadilly was an obvious candidate, it stated that it was not interested in buying the remaining stock but would prefer to find a third-party purchaser.

In May 1984, Jason C. Becker & Associates (Becker) offered to purchase all of plaintiff's assets and "certain liabilities" for $3 million. The offer contemplated that at least $700,000 and up to $1 million of the purchase price would be paid over the course of five years. In addition, Becker sought a contractual commitment from Piccadilly to purchase a minimum of $5.4 million in goods and services from plaintiff each year for the next five years. Becker based the $5.4 million figure on plaintiff's sales to Piccadilly in 1983, which was the highest level of purchases from plaintiff in Piccadilly's history.

After strenuous argument with Piccadilly, the Diebolt estate (Estate) eventually agreed to accept the Becker offer; but in June 1984, Piccadilly broke off negotiations with Becker. Thereafter, Piccadilly changed its position on buying the company and made an offer to Ben Freed and the Estate for their 50% share. The offering price was based on plaintiff's unaudited book value, which was then $342.85 per share. Freed accepted Piccadilly's offer. The Estate did not.

After acquiring Freed's 25% interest, and being unable to agree on a price with the Estate, Piccadilly decided to merge out the Estate, as the remaining minority shareholder. In the merger, a wholly

owned Piccadilly subsidiary, Piccadilly Acquisition, Inc. (a Louisiana corporation), was merged into plaintiff. As a result, plaintiff, which was the surviving corporation, became a wholly owned subsidiary of Piccadilly. Following statutorily prescribed procedures found in the Illinois Business Corporation Act of 1983 (Act) (Ill. Rev. Stat. 1985, ch. 32, par. 1.01 *et seq.*), Piccadilly sent a notice of proposed merger to the Estate, again offering $342.86 per share. The Estate again declined the offer, and, pursuant to the procedure set forth for dissenting shareholders in the Act, voted its shares in opposition to the merger. After consummation of the merger on August 23, 1984, Muriel Hughes, as executor of the Estate, served a "Written Demand for Payment of Shares" on plaintiff.

Under section 11.70(c) of the Act (Ill. Rev. Stat. 1985, ch. 32, par. 11.70(c)), plaintiff, as the surviving corporation, was required to set a value for the shares that were held by the dissenting shareholder. Based upon the advice of counsel, Piccadilly's chief financial officer, Jimmy Bennett, computed a weighted average based on three valuation methods—book value, earnings or investment value and adjusted book value—and determined the fair value of the stock to be $304 per share. After it received notice of plaintiff's valuation, the Estate served a notice of a shareholder's dissent, estimating the value of its stock to be $771.43 per share. As permitted by the statute, the Estate agreed to exchange its stock for the price offered by plaintiff, subject to later resolution through an appraisal proceeding. In October 1984, plaintiff paid $532,000 for the Estate's stock.

On April 19, 1985, plaintiff petitioned for a hearing to determine the "fair value" of the shares held by the Estate. On July 14, 1987, the trial court signed an agreed order appointing an independent appraiser, Richard Newman of James P. Richter & Company, "to receive evidence and recommend decision on the question of fair value," as provided in section 11.70(f) of the Act. Ill. Rev. Stat. 1985, ch. 32, par. 11.70(f).

In order to arrive at an opinion with respect to the fair value of the Estate's stock, Mr. Newman reviewed plaintiff's audited financial statements and other information for the years 1974 through 1983 and for the first six months of 1984. He also conducted a number of depositions, questioning plaintiff's auditors, Ben Freed, plaintiff's current management, Piccadilly personnel, and the Estate's attorney at the time of the negotiations with Becker, described above. In addition, Mr. Newman retained two other firms to determine the fair value of the real property and other fixed assets owned by plaintiff.

In his written report, Mr. Newman began with the proposition

that fair value means fair-market value, that is, "the price at which a willing buyer and a willing seller agree, neither being under any compulsion to buy or sell, and both having reasonable knowledge of the relevant facts." With this basis, Mr. Newman examined plaintiff's investment or earnings value, its adjusted book value, and its market value as reflected in various actual or proposed transactions.

Mr. Newman concluded that a purchaser of the Estate's stock would base the price it was willing to pay primarily on the company's past income-earning ability. In calculating a price for plaintiff's stock based on the company's historical earnings, Mr. Newman used what he described as "[t]he conventional approach" of "compar[ing] the closely-held entity [plaintiff] with selected publicly-held companies in similar lines of business." These comparable companies were used to derive an appropriate price/earnings multiple for plaintiff. That multiple was then applied to plaintiff's average earnings for the five-year period from 1980 through 1984 to arrive at a price as of the August 20, 1984, valuation date of $319.49 per share.

After arriving at an earnings value, Mr. Newman applied a 20% "illiquidity discount" to reach a final fair value of $256 per share. Mr. Newman explained that such a discount is necessary to account for the lack of a readily available market for closely held shares and "is often calculated in terms of the cost, as well as the price discount, that would be incurred in selling the shares by means of a registered public offering through an investment banking firm."

Mr. Newman also considered plaintiff's "adjusted book value." Based on its audited financial statements, plaintiff's unadjusted book value as of the date of the merger was $321.50 per share. Mr. Newman calculated plaintiff's "adjusted book value" by adding the appreciation in the fair-market value of plaintiff's real property and other fixed assets to the extent that that appreciation was not reflected in the values carried on the company's books. Mr. Newman did not attempt to determine whether the other assets reflected on plaintiff's books were being carried at fair-market value, nor did he attempt to calculate plaintiff's liquidation value. Mr. Newman specifically rejected liquidation value as a basis for evaluation because there was no plan to liquidate the company, and, as a minority shareholder, a hypothetical purchaser of the Estate's stock would not have the ability to force plaintiff to sell its assets. Though Mr. Newman took plaintiff's strong balance sheet into account in selecting a price-earnings multiplier, *he did not use adjusted book value* in arriving at his opinion with respect to fair value.

Finally, Mr. Newman also considered the two previous purchases

of plaintiff's stock (Diebolt's purchase of Shiffer's stock for $30 per share and Piccadilly's purchase of Freed's stock for $342.86) and the Becker offer in reaching his opinion with respect to value. The Shiffer sale was disregarded except as evidence of the difficulty of selling the stock. The 1984 Becker offer was also rejected as a "valid indicator of fair value," because part of the $3 million purchase price was to be deferred (thus, decreasing the value of the offer below $3 million), and the terms of the offer required a long-term contract from Piccadilly assuring Becker a minimum level of purchases.

At the trial, the court took testimony from Mr. Newman as the court's own witness. Plaintiff, which agreed with the court-appointed appraiser's evaluation, did not put on any expert witnesses with respect to valuation. The Estate, unsatisfied with Mr. Newman's evaluation, presented its own expert, John Jakucyk of the firm of Duff & Phelps, Inc.

Like the court-appointed appraiser, Mr. Jakucyk considered earnings or investment value to be the best method of determining the fair value of the Estate's stock. Mr. Jakucyk also used essentially the same methodology that Mr. Newman had used, as well as the same publicly traded companies selected by Mr. Newman as the basis for comparison. Unlike Mr. Newman, however, who chose a five-year period (1980-84) as the basis for comparison, Mr. Jakucyk used only three years (1982-84). Because plaintiff had lost money in 1981, the use of only three years gave plaintiff a much larger average earnings value, which translated to an estimated price as of August 20, 1984, of approximately $418 per share.

Unlike Mr. Newman, who had applied a discount to the earnings value of plaintiff's stock as a result of its illiquidity, Mr. Jakucyk testified that he believed a 30% premium was appropriate because the sale of the Estate's stock gave Piccadilly 100% control over plaintiff. When this premium was applied, Mr. Jakucyk's valuation rose to $538 per share.

After hearing the experts and other evidence, the trial court issued its opinion on October 10, 1989. In that opinion, the court rejected both experts' use of a "willing buyer/willing seller" test for plaintiff's stock, on the ground that there was no market at all for the stock. The court found that there were other "indicia of value" that enabled it to ignore the "artificial" fair-market value method chosen by the experts. The court cited Freed's sale to Piccadilly based on unadjusted book value and the Becker offer of $3 million (or approximately $428 per share) for the entire company in 1984. Because Piccadilly had bought Freed's stock based on unadjusted book value and

would, the court found, have been willing to accept Becker's offer for the whole company if it had been for the full $3 million (which the court described as its "real book value"), the court held that Piccadilly and plaintiff could not now contend that the fair value was less than the book value. Accordingly, the trial court adopted the August 1984 adjusted book value of $430 as the fair value of plaintiff's stock held by the Estate and entered judgment in favor of defendant in the amount of $220,500.

In its order, the trial court specifically rejected the Estate's argument that it was entitled to a control premium of 30%. It also rejected the court-appointed appraiser's opinion that there ought to be an illiquidity discount of 20%. Finally, the court noted that it had considered other conventional evaluation methods apart from book value, but had rejected them "because on this record we see no need to rely on artificial indicia of value."

Plaintiff filed a timely motion for reconsideration, arguing that the court's rejection of the methodology adopted by both experts and its adoption of adjusted book value as the sole indicator of fair value was in error. The trial court denied the motion without opinion, and this appeal followed.

On appeal, plaintiff contends that the trial court erred in refusing to use a fair-market value test; that the court below erred in relying solely on the stock's adjusted book value to determine its value; and that the trial court erred in refusing to apply a minority discount or a discount for illiquidity.

Plaintiff relies primarily on our supreme court's decision in *Ahlenius v. Bunn & Humphreys, Inc.* (1934), 358 Ill. 155. The *Ahlenius* court reversed the appellate court, which had relied solely on the company's book value in setting a value on the stock different from that set by the trial court. Plaintiff contends that the *Ahlenius* opinion makes it clear that a court in an appraisal proceeding may not rely solely on book value, as it maintains the trial court did here. This rejection of book value, asserts plaintiff, is based on two reasons. First, stock in the ongoing company must be evaluated on a going concern basis—book value, at best, measures only the company's liquidation value. Second, because book values do not necessarily reflect the fair-market value of the company's assets, book value is usually a highly unreliable approximation of the company's liquidation value.

Defendant argues that *Ahlenius* does not support reversal. Defendant points out that *Ahlenius* emphasizes that "precise rules for determining the value, whatever the descriptive term used, cannot be laid down." (358 Ill. at 168.) Defendant also cites the language in

*Ahlenius* which states that the trial court must exercise its judgment upon consideration of every relevant evidential fact and circumstance entering into the value of corporate stock. (358 Ill. at 168.) Moreover, defendant contends that *Ahlenius* is not on point, as it deals with the valuation of a publicly traded stock, not a closely held corporation as is the case here.

■ In *Stewart v. D.J. Stewart & Co.* (1976), 37 Ill. App. 3d 848, this court dealt with the issue of stock valuation demanded in a dissenting minority stockholder's suit. The *Stewart* court opined that the "[v]aluation of an interest in a close corporation is 'not an exact science, but involves many subjective and complex determinations.' " (37 Ill. App. 3d at 855, quoting O'Neill, Oppression of Minority Shareholders (Callaghan 1975).) The *Stewart* court also stated:

> "Defendants rely largely on *Ahlenius v. Bunn & Humphreys, Inc.*, 358 Ill. 155 (1934), as setting forth factors of earning capacity, including dividends, investment value of stock, the selling price of stocks of like character, the records and prospects of a corporation, and goodwill, in determining fair value. They contend that these standards were followed by defendants' experts but not by plaintiffs' expert Triebel whose valuation wrongly placed the greatest emphasis on book value. Defendants also suggest that most authorities do not rely on book value but rather consider three basic factors in valuing the stock of dissenting stockholders to a merger: market value, net asset value and earning value (also referred to as investment value). [Citations.]
>
> *The Illinois Supreme Court in Ahlenius does not, however, set forth absolute standards for valuing dissenting stockholders' stock upon a merger as defendants suggest. The discussion of the various standards which may apply is preceded by the specific warning by the court that 'Precise rules for determining the value *** cannot be laid down,' and that 'A situation is presented which calls for the exercise of judgment upon consideration of every relevant evidential fact and circumstance entering into the value of the corporate property and reflecting itself in the worth of the corporate stock.'* [Citation.] We do not conclude that *Ahlenius* absolutely precludes any consideration of book value. The court states, in effect, that 'mere' book value should not govern when it does not correspond to the fair value of the shares. [Citation.] It should also be noted that the court was speaking of the book value of a company about to go out of business and which had sustained losses for 3½ prior

years. And although the transaction was essentially a sale of assets the trial court considered only the book value which included the very suspect item of $100,000 for good will.

> *The propriety of taking book value into consideration as one factor to be weighed has been recognized in the authorities.*" (Emphasis added.) 37 Ill. App. 3d at 854-55.

It is clear that there is no one way to value the stock in a dissenting minority stockholders' suit. Moreover, book value is a factor to be considered in setting a value on stock. Thus, we find that *Ahlenius* does not require that we reverse the trial court's judgment.

■ Here, the trial court was faced with a contradictory and confusing array of figures, opinions, and estimates. Experts, Newman and Jakucyk, agreed that the stocks' adjusted book value was $430 per share. The parties do not dispute this figure. However, Mr. Newman opined that the proper valuation of the stock, based primarily on his price to earnings assessment and a 20% illiquidity discount was $256 per share. The trial court was justified in rejecting Mr. Newman's figure, as it was significantly less than the price of $342.86 per share originally offered by plaintiff for the Diebolt shares.

Further, the trial court properly refused to use the fair-market-value approach in this determination of per-share value. Fair-market value is based on the price that would be agreed upon in an arm's-length transaction between a willing buyer and a willing seller on the open market, neither under a compulsion to act, and both parties possessed of all relevant facts. The trial court correctly held that the fair-market-value method did not apply in a situation where a dissenting minority shareholder in a closely held corporation was being bought out by a majority stockholder.

Moreover, Mr. Newman's inclusion of the illiquidity discount, which lowered the price per share from $319.49 to $256 was counterbalanced by Mr. Jakucyk's determination that a 30% premium should be added to the stock price, because the stock purchase gave Piccadilly 100% control over plaintiff. Under this evidence, the trial court did not err in refusing to apply said discount.

Also, the fact that the court below rejected various measures of stock valuation does not mean that the court did not take them into account, as plaintiff argues. Indeed, in its order, the court stated:

> "The foregoing discussion of the facts does not mean that the court has ignored other conventional methods such as price earnings ratios, comparable market prices, cash flow, and dividend history. *They have been considered and rejected,*

because on this record we see no need to rely on artificial *indicia* of valuation." (Emphasis added.)

It is apparent that the court, after considering all the evidence, viewed the $430-per-share amount (adjusted book value) as the most equitable figure, falling as it did roughly midway between the two appraisals.

Under this record, the decision as to the respective weights given to the various valuation factors was particularly a matter for the trial court. (*Stewart*, 37 Ill. App. 3d at 856.) Here, the court was presented with sufficient information upon which to base its decision. It weighed the testimony of the court-appointed appraiser against defendant's appraiser, as well as reviewing extensive documentation and exhibits as to the stock's worth. The trial court's valuation of the subject stock reflected a careful assessment of all the evidence presented, and its conclusion is not against the manifest weight of the evidence. *Taxy v. Worden* (1989), 181 Ill. App. 3d 97.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

REINHARD and DUNN, JJ., concur.