**LASERAGE TECHNOLOGY CORPORATION, an Illinois Corporation, Plaintiff–Counterdefendant–Defendant–Appellant Cross–Appellee,**

and

**Arthur O. Capp, Counterdefendant–Defendant–Appellant Cross–Appellee,**

v.

**LASERAGE LABORATORIES, INCORPORATED, doing business as Laserage Technology Group Laboratories, a California Corporation, and Laserage Technology West, Incorporated, doing business as Laserage Technology Group West, an Oregon Corporation, Defendants–Plaintiffs–Appellees Cross–Appellants,**

and

**Laserage Technology Southeast Limited, doing business as Laserage Technology Group Southeast, a California Limited Partnership, Defendant–Appellee,**

and

**James E. Byrum, Individually and as Trustee of the Byrum Family Trust, Defendant–Counterclaimant–Appellee Cross–Appellant,**

v.

**CAPCO INCORPORATED, an Illinois Corporation, Grant Sisson, Theodore Otterbacher, et al., Counterdefendants–Appellees.**

Nos. 91–3497, 91–3555.

United States Court of Appeals, Seventh Circuit.

Argued May 21, 1992.

Decided Aug. 13, 1992.

William J. Gibbons (argued), Richard A. Levy, Mark S. Mester, Latham & Watkins, Chicago, Ill., for Laserage Laboratories, Inc.

Theodore J. Low (argued), Charles A. Valente, Altheimer & Gray, Chicago, Ill., Thomas Davis, Zion, Ill., for Laserage Technology Corp., Arthur O. Capp.

Before COFFEY and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

The central question in this appeal is whether the district court erred in concluding that the parties had reached a binding settlement of three related lawsuits. We conclude that the district court properly enforced the parties' settlement agreement and affirm for the reasons that follow.

I.

The trilogy of cases underlying this appeal arose out of related disputes arraying Laserage Technology Corporation ("Laserage") and its principal shareholder, Arthur O. Capp against James E. Byrum and the two corporations he controls, Laserage Laboratories, Inc. and Laserage Technology West, Inc. For form's sake, we refer to each side collectively as "LTC" and "Labs–West," respectively. The underlying disputes stemmed from a business relationship gone sour (Mr. Byrum is also a minority shareholder in Laserage), and contained various and overlapping claims for breach of contract, breach of fiduciary duties, trademark infringement, and misappropriation of trade secrets. LTC and Labs–West engaged in extensive and often acrimonious discovery from 1987 to 1990, making several unsuccessful attempts to settle their disputes along the way. Finally, on February 26, 1990, LTC and Labs–West appeared before Judge (now Chief Judge) Moran and reported that they had reached a settlement agreement resolving their disputes that provided for LTC's buy-out of Mr. Byrum's minority interest in Laserage. That settlement agreement was embodied in a series of correspondence that LTC and Labs–West had exchanged during the previous thirty days.

When LTC and Labs–West began to reduce their settlement agreement to a formal document, however, they encountered a snag as to a term concerning security for LTC's purchase of Mr. Byrum's shares in Laserage. LTC contended that the settlement agreement contemplated that Mr. Byrum would retain none of his shareholder rights during the gradual buy-out of his shares by LTC. Conversely, Labs–West contended that it had agreed that Mr. Byrum would relinquish voting rights for all his shares in Laserage, but would retain, as security, other shareholder rights in Laserage for those shares not yet purchased by LTC.[1] When the parties reported this snag to Judge Moran, he suggested that they resolve their purported differences through a mediator; that effort failed. Labs–West then moved to enforce the settlement agreement with LTC. After considering documentary evidence submitted by both LTC and Labs–West, Judge Moran granted Labs–West's motion, deciding that LTC and Labs–West had entered into a binding settlement agreement that included the retention of Mr. Byrum's shareholder rights (other than voting rights). R. 126. LTC sought reconsideration of the district court's order. R. 176. After again considering LTC's arguments and documentary submissions, Judge Moran denied LTC's motion by again concluding that LTC's position could not be reconciled with the con-

---

1. Mr. Byrum's retention of shareholder rights other than voting rights is significant because, among other things, it preserves his access to the books and records of Laserage and his ability to monitor Laserage's management during the time he is dependent on Laserage's profitability for his stock payments.

temporaneous correspondence and the representations made to the court in February. R. 129.

As provided by the parties' settlement agreement, Judge Moran then held a valuation hearing pursuant to Ill.Rev.Stat. ch. 32, ¶ 12.55(g) to determine the fair value of Mr. Byrum's Laserage shares. Expert's retained by both sides testified as to the fair value of Mr. Byrum's minority interest in Laserage. Supp.R., Tr. 15–92, 168–269. LTC's expert valued Laserage at $5,000,000, and concluded that the court should arrive at the value of Mr. Byrum's shares by applying a minority discount to his interest. See R. 188 at 3. Labs–West's expert proffered a figure of $6,364,000, and concluded that a minority discount was not applicable to Mr. Byrum's interest. R. 188 at 4. Based upon the testimonial and documentary evidence presented, Judge Moran set the value of Laserage at $6,000,000, finding Mr. Byrum's shares worth $1,235,375 ($13.13 per share) and declining to impose a minority discount. R. 188.

Next, Labs–West filed a motion seeking reimbursement of the expert fees it incurred in connection with the valuation hearing, see Ill.Rev.Stat. ch. 32, ¶ 12.55(g), and a motion seeking fees and costs it believed it unjustifiably incurred as a result of LTC's repudiation of the settlement agreement, see Fed.R.Civ.P. 11; 28 U.S.C. § 1927. R. 143–44. The district court denied Labs–West's motions, and entered final judgments in all three underlying cases. R. 72–74. Thereafter, both LTC and Labs–West appealed.

## II.

 LTC asserts that the district court erred in concluding that it had reached a binding settlement agreement with Labs–West that allowed Mr. Byrum to retain his shareholder rights. Principally, LTC believes that no enforceable agreement was reached because there was no "meeting of the minds" as to this security term. We

believe that LTC misconstrues the often-deceptive "meeting of the minds" metaphor.[2] "A settlement agreement is a contract and as such, the construction and enforcement of settlement agreements are governed by principles of local law applicable to contracts generally. Air Line Stewards and Stewardesses Assoc. v. Trans World Airlines, Inc., 713 F.2d 319, 321 (7th Cir.1983). Here, we look to Illinois contract law for guidance. In interpreting a contract under Illinois law, "the paramount objective is to give effect to the intent of the parties as expressed by the terms of the agreement." International Minerals & Chemical Corp. v. Liberty Mutual Insurance Co., 168 Ill.App.3d 361, 119 Ill.Dec. 96, 102, 522 N.E.2d 758, 764 (1988). Consequently, in assessing LTC's and Labs–West's intent, their "[s]ecret hopes and wishes count for nothing" because the "status of a document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves." Skycom Corp. v. Telstar Corp., 813 F.2d 810, 814–15 (7th Cir.1987) (reversing summary enforcement of settlement agreement where record did not reveal an existing, complete bargain). That is, Illinois follows the objective theory of intent. See Air Line Stewards, supra; East Richland Educ. Ass'n v. Illinois Educ. Labor Rel. Bd., 173 Ill.App.3d 878, 124 Ill.Dec. 63, 80–81, 528 N.E.2d 751, 768–69 (1988); Geier v. Hamer Enterprises, Inc., 226 Ill.App.3d 372, 168 Ill.Dec. 311, 321–22, 589 N.E.2d 711, 722–23 (1992). As a result, whether LTC and Labs–West had a "meeting of the minds" as to security for the purchase of Mr. Byrum's Laserage shares is determined by reference to what the parties expressed to each other in their writings, not by their actual mental processes. See Skycom, 813 F.2d at 814 (determination of "intent does not invite a tour through Walter's cranium, with Walters as the guide.").

We believe that the district court correctly determined that on the evidence avail-

---

**2.** See Farnsworth, Contracts § 3.6, at 118: "Discussions of this topic would be improved if this much-abused metaphor were abandoned. Its origins appear to go back to faulty etymology, under which it was wrongly supposed that the word 'agreement' was derived from agregatio mentium, a meeting of the minds."

able, a jury could reach but one conclusion about the binding quality of LTC's and Labs–West's settlement agreement and its provision to allow Mr. Byrum to retain shareholder rights (other than voting rights). *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986); *Skycom,* 813 F.2d at 817.[3] Because of the district court's extensive treatment of this issue, *see* R. 126, we highlight but a few of the factors that we believe conclusively supports the district court's decision. First, it was LTC that restarted the parties toward settlement on January 26 by proposing that Mr. Byrum relinquish his voting rights, but not his other shareholder rights, in Laserage.[4] R. 57, Ex. A. LTC consistently refused to provide Mr. Byrum a more traditional form of security (such as a letter of credit) for the purchase of his Laserage shares. R. 57 at 2. Second, on February 6, Labs–West specifically accepted LTC's January 26 proposal as to the security term. *Id.,* Ex. B. The next day, LTC responded to Labs–West, noting that it might "pay [Mr. Byrum] off quicker [than required] just to get rid of him." R. 57, Ex. C. It makes little sense for LTC to have an incentive to "get rid of" Mr. Byrum if it understood at this juncture that he had absolutely no shareholder rights. Without those rights, Mr. Byrum was simply an unsecured creditor.

Third, and perhaps most significantly, Labs–West's next response (February 9) to LTC explicitly refers to the "amended arbitration agreement attached to your January 26, 1990 proposal." R. 57, Ex. D. Thus, at this point it was apparent to all the world, including LTC, that Labs–West believed it was agreeing to allow Mr. Byrum to retain his shareholder rights other than voting rights. Despite that clarity, however, LTC's next communication with Labs–West did not repudiate Labs–West's clearly expressed understanding. Rather, LTC merely noted that "there will be no security, other than what we have set forth in our prior arbitration agreement for security on the payment of the stock" as it was summing up the settlement terms previously agreed upon at the end of its letter. R. 57, Ex. E. At this point, if LTC had desired to revert to a security arrangement other than as provided in the amended arbitration agreement, it was incumbent on LTC to say so.[5] LTC's claim that there was no "meeting of the minds" on this security term fails because it had every "reason to know the meaning attached" to this term by Labs–West. *See* Restatement of Contracts § 20 (bargain will not fail for lack of assent where one party knows or has reason to know the meaning attached to a term by the other party). Moreover, as noted above, LTC refused to provide Mr.

---

3. While a more deferential standard of review may be warranted, *see Merritt v. Faulkner,* 823 F.2d 1150, 1153 (7th Cir.1987) (per curiam) ("We agree with the district court's determination (to which we show considerable deference) that the agreement reached was a final settlement agreement ..."); *Borne v. A & P Boat Rentals No. 4, Inc.,* 780 F.2d 1254, 1258 (5th Cir.1986) (per curiam) (applying clearly erroneous standard), we have chosen to apply the de novo summary judgment standard because even under that more rigorous standard we conclude that the district court properly enforced LTC's and Labs–West's settlement agreement. *See Skycom,* 813 F.2d at 814–17 (applying summary judgment standard); *see also Tiernan v. DeVoe,* 923 F.2d 1024, 1031 (3d Cir.1991) (applying summary judgment standard but noting that a clearly erroneous standard may be appropriate where district court has made explicit findings); *Wang Laboratories, Inc. v. Applied Computer Sciences, Inc.,* 958 F.2d 355, 359 (Fed.Cir.1992) (applying summary judgment standard).

4. This proposal incorporated what the parties called an "amended arbitration agreement." The amended arbitration agreement consists of interlineations originally made by Labs–West to a draft arbitration agreement proposed by LTC. As amended, the agreement required Mr. Byrum to relinquish his voting rights in Laserage, but allowed him to retain his other shareholder rights. LTC attached this amended arbitration agreement to its January 26 proposal and specifically referred to the amended version in its proposal. *See* R. 122 Ex. A.

5. Similarly, LTC's argument that its January 26 proposal was a "stand alone" proposal, or that its February 14 correspondence represented a "radically different proposal" fails by this same logic. While LTC had every right to make a "stand alone" proposal or to propose "radically different terms" during a counter-offer, it had to manifest that intention. There is no evidence in the record that LTC did so; unexpressed intentions do not count.

Byrum any security other than the retention of his shareholder rights. Thus, it would defy common sense to say "no security other than" if there was no security! As Judge Learned Hand noted, "there is a critical breaking point ... beyond which no language can be forced." *Eustis Mining Co v. Beer, Sondheimer & Co.*, 239 F. 976, 982 (S.D.N.Y.1917).

■ LTC's remaining arguments on this issue require only brief discussion. First, LTC mistakenly contends that *United States v. Orr Construction Co.*, 560 F.2d 765 (7th Cir.1977), requires that we find the parties' settlement agreement unenforceable. In *Orr*, the parties conditioned settlement on receiving "proper legal releases from all parties," but then could not agree on what legal releases were proper. We decided that the attempted settlement agreement was unenforceable because the "phrase 'proper legal releases' could have any number of meanings depending on the view of the person interpreting it" making it "impossible to attach a definite meaning to the agreement." *Id.* at 770, 772. In this case, however, there are no terms that present such vagueness or indefiniteness problems. Perhaps if LTC and Labs–West had simply agreed that Labs–West would receive "proper legal security" for the payment of his Laserage stock, and left it at that, then this case would be closer to the situation we faced in *Orr*. *Orr* does not advance LTC's case.

■ In further support of its position that the parties' settlement agreement is unenforceable, LTC presented several arguments to this Court that it did not present below. LTC's arguments that the parties did not intend to be bound prior to the execution of a formal written agreement, that the parties' settlement agreement is proscribed by the Statute of Frauds, and that LTC's counsel lacked the authority to reach a settlement agreement were not presented to the district court although LTC had ample opportunity to do so. Because of this procedural deficiency, and because our full review of the record in this case convinces us that there are no exceptional circumstances present to avoid waiver, we deem these arguments waived on appeal. *E.g., Manor Healthcare Corp.*

*v. Guzzo*, 894 F.2d 919, 922 (7th Cir.1990); *Washington v. Electrical Joint Apprenticeship and Training Comm.*, 845 F.2d 710, 715 (7th Cir.), *cert. denied*, 488 U.S. 944, 109 S.Ct. 371, 102 L.Ed.2d 360 (1988).

■ Likewise, LTC's contention that the district court should have held a hearing before granting Labs–West's motion to enforce the settlement agreement was not presented to the district court. The most LTC did in this regard was request oral argument when it filed its motion for reconsideration of the district court's order enforcing the settlement agreement. R. 176 at 9. That is too little, too late. *Bally Export Corp. v. Balicar, Ltd.*, 804 F.2d 398, 404 (7th Cir.1986) (raising issue or new legal theories for first time in motion for reconsideration does not save it for appeal); *Publishers Resource, Inc. v. Walker–Davis Publications, Inc.*, 762 F.2d 557, 561 (7th Cir.1985) (same). Moreover, even after briefing and oral argument in this Court, LTC has yet to identify what evidence a jury at trial would hear, or what evidence a court holding a hearing would hear, other than that before the district court. *See Skycom*, 813 F.2d at 817. Accordingly, we deem this argument waived on appeal as well. *E.g., Manor Healthcare*, 894 F.2d at 922; *Washington*, 845 F.2d at 715.

In sum, we have fully considered all of LTC's properly presented arguments and we are convinced that the district court correctly concluded, based on the undisputed documentary record before it, that the parties' objective manifestations of intent all pointed to a desire to be bound by a settlement agreement providing that Mr. Byrum could retain his shareholder rights other than voting rights. The parties' correspondence reveals an existing, complete bargain; there is nothing in the record to indicate otherwise. *See Skycom*, 813 F.2d at 816. We affirm the district court's decision to enforce LTC's and Labs–West's settlement agreement.

### III.

■ LTC also contends that the district court erred in not applying a minority discount to arrive at the "fair value" of Mr. Byrum's holdings in Laserage. *See* Ill. Rev.Stat., ch. 32, ¶ 12.55(g) ("court shall

determine the fair value of the shares ...". LTC believes that "fair value" under paragraph 12.55(g) is synonymous with "fair market value," and that fair market value includes a minority discount. We disagree. Illinois courts have made clear that the two terms are not necessarily synonymous. *Institutional Equipment & Interiors, Inc. v. Hughes,* 204 Ill.App.3d 922, 150 Ill.Dec. 132, 137–38, 562 N.E.2d 662, 667–68 (1990) (fair market value not appropriate measure of fair value where dissenting minority shareholder bought out by majority shareholder). Rather, according to the Illinois Supreme Court, the determination of fair value is a matter vested in the sound discretion of the fact finder, and will not be disturbed absent mistake or prejudice. *Stanton v. Republic Bank of South Chicago,* 144 Ill.2d 472, 163 Ill.Dec. 524, 528, 581 N.E.2d 678, 682 (1991) (identifying nonexhaustive list of factors trial court may consider); *see also Hughes, supra* (minority discount not applicable); *Independence Tube Corp. v. Levine,* 179 Ill. App.3d 911, 129 Ill.Dec. 162, 166, 535 N.E.2d 927, 931 (1988) (minority discount supportable where experts for both sides employed one).

The district court's decision not to apply a minority discount to Mr. Byrum's shares is well supported by the record. After noting that there were no "relatively comparable companies with recent stock sales to use for comparison," the court considered the history and nature of the Laserage business, the economic outlook for Laserage, the book value of the company as determined by the parties' experts, the fact that Laserage is a close corporation, and the fact that the buy-out would mean that Laserage would no longer "be required to deal with a substantial minority interest which has been the adversary in a protracted, emotional and undoubtedly very expensive complex of legal proceedings." R. 138 at 3. These are all permissible considerations, and the district court's valuation is well within the range of evidence presented. *Stanton,* 163 Ill.Dec. at 528, 581 N.E.2d at 682. Moreover, the district court's decision makes sense; while one might be subject to a minority discount if he sold his minority interest to a third party, it does not follow that a similar discount should necessarily apply when the majority shareholder is the purchaser. *See* Thomas J. Bamonte, *Measuring Stock Value in Appraisals Under the Illinois Business Corporation Act,* 80 Ill.B.J. 236 (May 1992) ("fair value" should not include minority or marketability discounts in appraisal proceedings). The district court's decision not to apply a minority discount to Mr. Byrum's shares is affirmed.

### IV.

As a final matter, we have fully considered Labs–West's cross appeal and find it to be without merit. The district court did not abuse its discretion in denying Labs–West's motion for reimbursement of expert fees, *see Taxy v. Worden,* 181 Ill. App.3d 97, 129 Ill.Dec. 851, 536 N.E.2d 901 (1989), nor in denying Labs–West's motion for sanctions against Laserage. *See Mars Steel Corp. v. Continental Bank, N.A.,* 880 F.2d 928, 933–34 (7th Cir.1989). Both decisions are well supported by the record in this case; we see no reason to disturb the district court's determinations.

AFFIRMED.