**In re Thomas Patrick HARPER, Debtor.**

**Bankruptcy No. 91–20002M.**

United States Bankruptcy Court,
E.D. Arkansas,
Helena Division.

Aug. 13, 1993.

Gerald Coleman, West Memphis, AR, for Farm Credit Bank of St. Louis.

Arens Law Firm, Fayetteville, AR, for debtor.

A.L. Tenney, N. Little Rock, AR, Chapter 12 Trustee.

### ORDER

JAMES G. MIXON, Chief Judge.

On January 7, 1991, Thomas Patrick Harper (the debtor) filed a voluntary petition for relief under the provisions of Chapter 12 of the United States Bankruptcy Code. On August 26, 1991, confirmation of the debtor's plan was denied and the debtor was granted 20 days to file a modified plan. The debtor filed his second amended plan of reorganization on January 15, 1992. The debtor filed additional modifications of his second amended plan of reorganization on February 13, 1992, and May 11, 1992. Farm Credit Bank of St. Louis (Farm Credit) objects to the amended plan. Ford Motor Credit Company, the Small Business Administration, and MidSouth Bank also filed objections which were withdrawn before trial. A confirmation hearing was held on March 19, 1992, and May 26, 1992, and the matter was taken under advisement.

The matter before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L) (1988), and the Court has jurisdiction to enter a final judgment.

## I

### BACKGROUND

The debtor's second amended plan lists twelve classes of creditors. Farm Credit's claim is listed in the amended plan in the amount of $239,500.00, secured by a first mortgage on tracts 2 and 3 of the debtor's real property. The debtor's plan valued tract 2 at $68,000.00 and tract 3 at $60,000.00.

The debtor's amended plan treats Farm Credit's claim as follows:

The following secured creditors will retain the liens securing their claims and be paid the present value of their collateral or the amount of their claims, whichever is less, pursuant to 11 U.S.C. § 1225(a)(5)(B) and § 1222(b)(9). Any amount claimed in excess of the value of the collateral shall be treated as a Class Twelve general unsecured claim. Upon consummation of the Plan, and upon the completion of the payments provided herein with respect to a creditor's allowed secured claim, such creditor's liens upon property of the estate or of the debtors shall be fulling [sic] extinguished. Specific payments shall be made as set forth below:

*Class Three:*

NAME OF CREDITOR: Farm Credit Bank

COLLATERAL: 1st Mortgage on Tracts 2 and 3

PRESENT AMOUNT OF CLAIM: $239,500.

VALUE OF COLLATERAL: $128,000.

CASH PAYMENT AT CONFIRMATION: $10,000.

INTEREST RATE PAID ON BALANCE BY PLAN: 8.5%

INSTALLMENT PAYMENT: $10,980. (Annually)

NUMBER OF INSTALLMENTS: 30

TOTAL OF PAYMENTS: $329,400.

TOTAL OF PAYMENTS THROUGH PLAN: 3/$32,940.

DATE OF FIRST PAYMENT TO TRUSTEE: January 30, 1993

. . . .

In order to effectuate the terms of the foregoing schedule of payments, the debtor proposes to make a cash payment of $49,587. at confirmation; monthly payments in the amount of $517; semi-annual payments in the amount of $1,490.; and annual payments in the amount of $52,969. to the standing Chapter 12 Trustee. The monthly installments will be paid beginning in April 1992. The semi-annual payments shall [sic] paid in September of 1992 and 1993 and March of 1993 and 1994. The annual installments shall be paid in January of each year of the Plan, commencing with the year 1993. The period of the Plan shall be 3 years.

Farm Credit objects to confirmation of the debtor's plan and asserts that the plan (1) vastly undervalues the debtor's interest in P.L.R. & M., Inc., stock; (2) does not provide the same treatment for all secured claims; (3) does not propose to pay the present value of its claim as required by 11 U.S.C. § 1225(a)(5)(B); (4) does not comply with 11 U.S.C. § 1225(a)(4) because the plan does not propose to pay at least as much as Farm Credit would receive if the debtor were to liquidate under the provisions of Chapter 7; and (5) is not feasible as required by 11 U.S.C. § 1225(a)(6).

## II

## VALUE OF P.L.R. & M., INC. STOCK

P.L.R. & M., Inc., is a closely-held, subchapter S corporation. P.L.R. & M.'s shareholders consist of Harper family members. The debtor and his wife own 238 shares, or approximately 25%, of the outstanding stock in P.L.R. & M. The debtor's father and siblings own the balance of the stock; however, no shareholder owns a majority of the outstanding shares.

P.L.R. & M. owns several tracts of farm land in Craighead County and Greene County, Arkansas,[1] and the corporation leases the land annually. None of the corporation's assets is encumbered. One tract of land contains a 3,800 square foot home leased by the debtor's father.[2] Both the debtor and Farm Credit Bank presented testimony regarding the value of the P.L.R. & M. stock.

### A

### *Debtor's valuation of the P.L.R. & M. stock.*

James S. Schultze (Schultze), of Schultze–Maechling & Associates, Inc., testified on behalf of the debtor regarding the valuation of the P.L.R. & M. stock. Schultze is engaged primarily in the preparation of business appraisals. Schultze's evaluation is based on his review of tax returns, a compilation statement prepared July 31, 1991, the corporate by-laws of P.L.R. & M., directors' meeting minutes, a real estate appraisal by Jim Grisham, and a second real estate appraisal by Chad Kelly.

Schultze first addressed the earning power of P.L.R. & M. and determined that the income potential indicates a very low value. He then examined P.L.R. & M.'s balance sheet. The balance sheet valued the assets of the corporation at acquisition cost rather than at current market value. He applied various adjustments in order to determine the current value of assets. Schultze adjusted the value of the land and buildings from their cost basis to a current appraised value.[3] He deleted the book value of buildings from the financial statement because

---

1. The Craighead County land consist of a 32–acre tract, a 40–acre tract, and a 91–acre tract. The Greene County land consists of a 160–acre tract of land.

2. The debtor's father, Dr. B.L. Harper, became deceased after the confirmation hearing.

3. Jim Grisham testified regarding the value of the land owned by P.L.R. & M., Inc. Grisham is a farm financial consultant and farmer. He owns and farms property located near the property owned by P.L.R. & M. Grisham did not value the P.L.R. & M. property in anticipation of the hearing, but rather had previously valued the property in August of 1991, for the debtor's father, Dr. B.R. Harper. Grisham placed a total fair market value on the land with improvements at $375,775.00.

the buildings were provided for by the first adjustment. Schultze also deleted the value of the machinery and equipment from the balance sheet since it is not owned by the corporation. He deleted the depreciation reserve from consideration and deleted the value of a promissory note receivable because the promisor was deceased and there was no reasonable expectation the note would be paid. Schultze reduced the value of certain potential patronage dividends issued by agricultural cooperatives by 50%. Schultze testified that since it was questionable whether the cooperatives would pay dividends in the future, the dividends should not be valued at face value. Finally, he applied a contra entry to adjust retained earnings.

Schultze concluded that the adjustments resulted in an increased shareholder net equity from $424,599.00 to $827,342.00, and an increased value per share from $442.29 to $861.81.[4] The adjusted basis was Schultze's opinion of the value of the corporation as a whole.

Schultze testified that several factors must be considered when applying discounts to the value of stock in closely-held corporations. He stated that discounts are always applied when valuing closely-held securities due to a lack of marketability. Schultze emphasized that P.L.R. & M. is a family-owned corporation, and a transfer to an outsider would not be viewed as a friendly transaction. He stated that a further discount is appropriate because the block of shares in question constitutes a minority interest in the corporation. Schultze determined that a restriction on transfers also warranted a discount. Schultze testified that the value should also be decreased because the corporation's by-laws prohibit its real estate from being used as collateral for any loan. Schultze stated that the shareholders could be as-

sessed if the corporation required additional cash.

Schultze concluded that the following discounts were appropriate: a 10% discount for the lack of marketability of closely-held corporation shares; a minority interest discount of 25%; and a 20% discount for restrictions on corporate borrowing and transfers of shares, for a total discount of 55%. Schultze determined that the market value of the P.L.R. & M. stock is $388.00 per share. Therefore, the market value of 119 shares, representing half of the shares the debtor owns jointly with his wife, totals $46,172.00.

### B

### Farm Credit Bank's valuation of the P.L.R. & M. stock.

Ken Thomas, a certified public accountant employed by Farm Credit, testified regarding the value of the P.L.R. & M. stock. His valuation was based solely upon P.L.R. & M.'s tax returns for the years 1986 to 1991.[5] He made adjustments to the income and expenses reflected in the tax returns. Thomas stated that a $5,000.00 management fee and a $27,750.00 land leveling fee the corporation had paid recently were not ordinary expenses. He added these amounts to the income of the corporation to arrive at an average five year income of $43,927.00.

Thomas used the income approach to value the stock. The income approach uses the average earnings of the company and the expected rate of return for a similar type of investment. He utilized a 6% rate of return which indicated a value of $732,000.00 for the corporation as a whole, representing 100% of the corporation stock. He stated that no discount should be applied, although he acknowledged that as a "rule of thumb" a 10% percent discount is usually applied. Based upon Thomas's val-

---

**4.** Schultze testified that there are 940 outstanding shares of P.L.R. & M. stock; however, his per share values indicate outstanding shares of 960 shares. For purposes of this opinion, 960 shares will be considered the outstanding P.L.R. & M. stock.

**5.** Farm Credit presented Tommy Messer, a real estate appraiser employed by Farm Credit, to testify regarding the value of the land owned by P.L.R. & M., Inc. Mr. Messer appraised the total value of the land at $477,000.00; however, Mr. Thomas did not use Mr. Messer's appraisals when valuing the stock.

uation of the corporation, the market value of the debtor's P.L.R. & M. stock is $762.50 per share, for a total of $90,737.50.

## C

### Discussion

Courts have held that no one factor governs the valuation of shares of stock in a closely-held corporation but that all factors, such as market value, asset value, and future earning prospects, should be considered. *Hubbard v. United States (In re Hubbard)*, 135 B.R. 430 (Bankr.S.D.Fla. 1991); *Universal City Studios, Inc. v. Francis I. duPont & Co.*, 334 A.2d 216 (Del.1975); *General Sec. Corp. v. Watson*, 251 Ark. 1066, 477 S.W.2d 461 (1972); *Institutional Equip. & Interiors, Inc. v. Hughes*, 204 Ill.App.3d 922, 150 Ill.Dec. 132, 562 N.E.2d 662 (1990). "Stock of closely-held corporations cannot reasonably be valued by application of any inflexible formula; one tailored to the particular case must be found. This can be done only after a discriminating consideration of all relevant facts and circumstances bearing upon the stock's value." William M. Fletcher, *Fletcher Cyclopedia Corp.*, § 5906.12 (Supp.1992) (citing *Institutional Equip. & Interiors, Inc. v. Hughes*, 204 Ill.App.3d 922, 150 Ill.Dec. 132, 562 N.E.2d 662 (1990)).

Once the value of a closely-held corporation's shares is determined, the application of discounts may be appropriate in certain situations. William M. Fletcher, *Fletcher Cyclopedia Corp.*, § 5906.12 (Perm. ed. 1984). Marketability problems often affect shares of closely-held corporations. *In re Seagroatt Floral Co.*, 78 N.Y.2d 439, 576 N.Y.S.2d 831, 583 N.E.2d 287 (1991). A marketability discount may be applied to reflect the lack of liquidity of the shares of a closely-held corporation. *Institutional Equip. & Interiors, Inc. v. Hughes*, 204 Ill.App.3d 922, 150 Ill.Dec. 132, 562 N.E.2d 662 (1990). While a lack of a public market for the shares of a closely-held corporation should be considered in determining what a willing purchaser would pay for the shares, there is no single method for calculating the fair market value. *Fletcher Cyclopedia Corp.*, § 5906.12 (Supp.1992). One method to determine the lack of liquidity is to apply a percentage discount against the stock value. *Hubbard v. United States (In re Hubbard)*, 135 B.R. 430 (Bankr.S.D.Fla.1991); *In re Opelika Mfg. Corp.*, 66 B.R. 444 (Bankr.N.D.Ill. 1986); *Estate of Murphy v. Commissioner*, 60 T.C.M. (CCH) 645, 1990 WL 125107 (1990); *In re Seagroatt Floral Co.*, 78 N.Y.2d 439, 576 N.Y.S.2d 831, 583 N.E.2d 287 (1991); *Institutional Equip. & Interiors, Inc. v. Hughes*, 204 Ill.App.3d 922, 150 Ill.Dec. 132, 562 N.E.2d 662 (1990). The lack of marketability discount is separate from, and bears no relation to, a minority discount. *Charland v. Country View Golf Club, Inc.*, 588 A.2d 609 (R.I.1991).

"Minority shareholders' interests, particularly in closely-held corporations, are often devalued because of their lack of control." *Fletcher Cyclopedia Corp.*, § 5906.12 (Perm. ed. 1984). *See Walter S. Cheeseman Realty Co. v. Moore*, 770 P.2d 1308 (Colo.Ct.App.1988) (a block of minority shares does not possess the "control element of value" and is therefore less valuable and less attractive to potential buyers); *see also Perlman v. Permonite Mfg. Co.*, 568 F.Supp. 222 (N.D.Ind.1983), *aff'd*, 734 F.2d 1283 (7th Cir.1984); *Estate of Murphy v. Commissioner*, 60 T.C.M. (CCH) 645, 1990 WL 125107 (1990); *Moore v. New Ammest, Inc.*, 6 Kan.App.2d 461, 630 P.2d 167 (1981).

Farm Credit's argument that no discounts are appropriate for stocks in a family-owned corporation is unreasonable. Even though no one shareholder owns a controlling interest in the stock, all shareholders are family members. A hypothetical purchaser would realistically assume that the family members would vote together to create a majority interest against any unrelated shareholder. The discounts applied by the debtor's expert witness appear appropriate in light of discounts applied in other cases. *See Perlman v. Permonite Mfg. Co.*, 568 F.Supp. 222 (N.D.Ind. 1983), *aff'd*, 734 F.2d 1283 (7th Cir.1984) (20% lack of marketability discount and re-

striction of share transfer discount); *Estate of Murphy v. Commissioner*, 60 T.C.M. (CCH) 645, 1990 WL 125107 (1990) (20% lack of marketability discount and restriction of share transfer discount); *In re Opelika Mfg. Corp.*, 66 B.R. 444 (Bankr. N.D.Ill.1986) (50% discount for minority interest); *Moore v. New Ammest, Inc.*, 6 Kan.App.2d 461, 630 P.2d 167 (1981) (20% discount for minority interest).

The Court finds that Schultze's testimony is decidedly more persuasive than that given by Thomas. Therefore, the value of the debtor's half of 238 shares of the P.L.R. & M. stock, i.e., 119 shares, is determined to be $46,172.00, rather than $30,000.00 as provided in the plan.[6]

## III

### 11 U.S.C. § 1222(a)(3) (1988)

### UNFAIR DISCRIMINATION OF FARM CREDIT'S SECURED CLAIM

█ Farm Credit also contends that it is being treated differently under the plan than MidSouth Bank, another secured creditor of the debtor. At the trial, the debtor and MidSouth Bank announced an agreement to propose a modified plan which reduces the debtor's payment period to MidSouth Bank from thirty years to twenty-five years. Farm Credit argues that the plan unfairly discriminates against it because the payment period to Farm Credit is thirty years.

█ 11 U.S.C. § 1222(a)(3) (1988) states that "if the plan classifies claims and interests, [it shall] provide the same treatment for each claim or interest within a particular class." The plan classifies Farm Credit's claim in Class Three, and MidSouth Bank's claim is classified in Class Five. The Code does not prohibit unequal treatment of claims that are properly classified in different classes so long as the discrimination is not unfair. *See* 5 Lawrence A. King et al., *Collier on Bankruptcy* ¶ 1222.03 (15 ed. 1989). If the plan meets all the requirements of the Code in regard

to Farm Credit's claim, the debtor has fulfilled his obligations under the Code. The fact that this debtor is willing to do more for MidSouth Bank than required by the Code is not unfair to Farm Credit. There is no requirement that secured creditors in different classes be treated equally.

## IV

### 11 U.S.C. § 1225(a)(5)(B) (1988)

### THE PRESENT VALUE OF FARM CREDIT'S CLAIM

█ Farm Credit also contends that the debtor's plan does not propose to pay an adequate rate of interest on Farm Credit's secured claim. 11 U.S.C. § 1225(a)(5)(B) provides that a plan will be confirmed if:

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim.

11 U.S.C. § 1225(a)(5)(B) (1988). In order for a creditor to receive the present value of its claim under this section, the interest rate thereon must be comparable to the current market rate for a loan under similar circumstances. *United States v. Doud*, 869 F.2d 1144 (8th Cir.1989); *In re E.I. Parks No. 1 Ltd. Partnership*, 122 B.R. 549 (Bankr.W.D.Ark.1990); *In re Batchelor*, 97 B.R. 993 (Bankr.E.D.Ark.1988). In determining this rate, the Court must consider "the market rate for a loan of a term equal to the payout period, with due consideration to the quality of the security and risk of subsequent default." 5 Lawrence A. King et al., *Collier on Bankruptcy* ¶ 1225.03[4][c] (15th ed. 1991).

The plan provides for a $10,000.00 cash payment to Farm Credit upon confirmation, to be followed by thirty annual install-

---

**6.** The debtor testified at trial that he accepts his expert's valuation, even though his plan proposes a $30,000.00 value.

ments of $10,980.00, including interest at the rate of 8.5% per annum on any unpaid principal balance. The debtor testified that the 8.5% interest rate was derived by adding two percentage points to the prime rate.

Davey Crockett, manager of Farm Credit's high risk asset unit, testified regarding the appropriate interest rate. Crockett testified that the debtor's loan is a 100% loan and that Farm Credit does not make 100% loans. Crockett stated that an 8.5% interest rate is the amount offered to its best customers, and a variable interest rate of 10.25% is the standard rate for borrowers similar to the debtor. Farm Credit introduced no evidence explaining how it arrived at these interest rates other than stating that a 10.25% variable interest rate was its desired rate for the debtor's loan.

■ Calculating the market rate of interest solely from the viewpoint of a hypothetical coerced lender is inappropriate. *In re E.I. Parks No. 1 Ltd. Partnership*, 122 B.R. 549, 555 (Bankr.W.D.Ark.1990). Also, the Eighth Circuit Court of Appeals has rejected the use of a variable rate of interest. *United States v. Neal Pharmacal Co.*, 789 F.2d 1283, 1286 (8th Cir.1986).

■ This Court has adopted the view that an appropriate rate of interest should be based upon a risk-free rate such as the rate paid on government securities plus a risk factor appropriate to the case. *See In re E.I. Parks No. 1 Ltd. Partnership*, 122 B.R. 549, 556 (Bankr.W.D.Ark.1990). The debtor has the burden of proof to establish that the plan meets confirmation standards. *See* 5 *Collier on Bankruptcy* ¶¶ 1225.01, 1225.03[c] (15th ed. 1991). Here, the debtor's evidence is not sufficient to establish a basis for the proposed interest rate. The debtor testified that the base rate was a "prime rate" but he did not indicate the source of the prime rate. Furthermore, this Court in *E.I. Parks* deter-

mined that a risk-free rate such as treasury bills should be used to establish a base rate. Since the debtor did not meet his burden of proof, Farm Credit's objection is sustained.

### V

### 11 U.S.C. § 1225(a)(4) (1988)
### LIQUIDATION ANALYSIS

■ Farm Credit asserts that the plan does not comply with 11 U.S.C. § 1225(a)(4) because the plan does not propose to pay Farm Credit's unsecured claim at least as much as Farm Credit would receive if the debtor were to liquidate under Chapter 7 of the United States Bankruptcy Code. Section 1225(a)(4) provides:

> (a) Except as provided in subsection (b), the court shall confirm a plan if—
>
> . . . .
>
> (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date. . . .

11 U.S.C. § 1225(a)(4) (1988).

The debtor's plan provides for unsecured creditors as follows:

> *Class Twelve:* Unsecured creditors shall be paid pro rata, from a minimum dividend of $44,500.[sic], this being the amount the unsecured creditors would receive if this were a proceeding under Chapter 7 of the Bankruptcy Code. A $10,000. cash payment will be made at confirmation, with the remainder paid in three annual payments, beginning January 30, 1993. Unsecured creditors will also receive the disposable income of the debtor for the first three crop years of the plan.

## LIQUIDATION ANALYSIS

| PROPERTY | MARKET VALUE | AMOUNT OF LIEN |
|---|---|---|
| Tract 1 | $ 75,000. | $ 75,000. |
| Tract 2 | 68,000. | 239,500. |
| Tract 3 | 60,000. | 239,500. |
| Tract 4 | 2,500. | –0– |
| 1989 Ranger | 5,500. | 5,545. |
| 1988 Ford Truck | 5,000. | –0– |
| Farm Equipment | 137,100. | 254,214. |
| Guns | 400. | –0– |
| Coins/Silver | 400. | –0– |
| Sporting Equip. | 1,200. | –0– |
| PLR & M Stock | 30,000. | –0– |

According to the debtor's plan, the total equity available to pay unsecured creditors in a hypothetical liquidation under Chapter 7 is $44,500.00.[7]

Farm Credit's objection to the debtor's liquidation analysis primarily concerns the value given to the P.L.R. & M. stock. The Court has determined the value of the stock to be $46,172.00. Therefore, the correct amount of equity available for liquidation under a hypothetical Chapter 7 case is $55,672.00, not the sum of $44,500.00 as provided in the plan. Therefore, the plan fails to comply with § 1225(a)(4) because it proposes to pay unsecured creditors less than they would receive under a Chapter 7 proceeding. Farm Credit's objection based upon § 1225(a)(4) is sustained.

### VI

### 11 U.S.C. § 1225(a)(6) (1988)

### FEASIBILITY

■ Farm Credit objects to the debtor's plan on the ground that it does not meet the requirements of feasibility as provided for in 11 U.S.C. § 1225(a)(6). Section 1225(a)(6) provides:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

. . . .

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

11 U.S.C. § 1225(a)(6) (1988). To determine the feasibility of a plan, the Court must ascertain the "probability of actual performance of the provisions of the plan." *Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson),* 767 F.2d 417, 420 (8th Cir.1985); *In re Butler,* 101 B.R. 566, 567 (Bankr. E.D.Ark.1989).

■ The purpose of Chapter 12 is to promote the reorganization of family farmers, and the debtor is given the "benefit of the doubt" on the issue of feasibility. *In re Snider Farms, Inc.,* 83 B.R. 1003, 1013 (Bankr.N.D.Ind.1988). The debtor is not required to guarantee the ultimate success of his plan, but only to provide a reasonable assurance that the plan can be effectuated. *Id.* at 1011. "The plan's ability to cash flow may be analyzed by comparing the income available to the payments required under the plan." *In re Rott,* 94 B.R. 163, 170 (Bankr.D.N.D.1988).

The debtor introduced a projected 1992 farm cash flow statement. The debtor projected $10,000.00 in wheat sales, $64,450.00 in rice sales, $23,945.00 in government payments, and $122,571.00 in soybean sales, for a total of $220,966.00 in operating receipts. He testified that he was also to

7. The plan states that $44,500.00 is the total equity available for liquidation; however, calcu-

lation of the debtor's liquidation analysis reveals only $39,500.00 is available in total equity.

receive $3,500.00 in crop insurance proceeds. The plan provides a total of $125,-152.00 in operating expenses, $12,000.00 in living expenses, $5,000.00 in income taxes, $3,177.00 in trustee fees, and $59,994.00 in debt service payments. The total projected cash inflow, $224,466.00, minus the total expenses, $205,323.00, yields a cash excess of $19,143.00.[8]

The debtor introduced an exhibit that compared his projected 1991 farm cash flow with the actual totals of his 1991 farm cash flow. The debtor received $4,158.00 in wheat receipts, $61,638.00 in rice receipts, $39,411.00 in government payments, $62,962.00 in crop insurance, and $123,-214.00 in soybean receipts, for total operating receipts of $291,383.00. He received $4,824.00 in other income, increasing his total cash inflow to $296,207.00. The statement lists total operating expenses of $173,999.00, living expenses of $13,699.00, adequate protection payments of $2,707.00, and debt service payments of $16,116.00, for total expenses of $206,521.00. The statement listed a positive cash flow of $89,686.00. The statement filed with the original plan projected a cash flow of $97,-577.00. The actual cash flow was within $8,000 of the projected cash flow.

The debtor based his projected crop production on his past crop performance. The debtor stated that he planned to reduce his wheat crop which would result in less expenses. He testified that by leasing farm equipment, instead of buying it, he will save a substantial sum of money since he will not be responsible for repairs. The debtor testified that he is in good standing with his trade creditors and may obtain operating loans if needed for months with limited income.

The debtor's plan proposes a cash flow sufficient to make all required payments. The debtor's projected cash flow statement for 1991 proved to be substantially accurate. Considering all of the circumstances, the debtor's plan is feasible, and therefore, Farm Credit's objection is overruled.

### VII

### CONCLUSION

Farm Credit's objections based upon 11 U.S.C. § 1225(a)(4) and § 1225(a)(5)(B) (1988) are sustained. All other objections by Farm Credit are overruled. The debtor has twenty days to file a modified plan consistent with this opinion. If no such modification is filed, the case will be dismissed.

IT IS SO ORDERED.

---

8. This amount fails to include a $2,500.00 payment for a tractor lease.